# DECISIONS

## OF THE

# Supreme Court of Florida,

## AT TERMS HELD IN 1862.

SAMUEL STEPHENS, SHERIFF AND EX-OFFICIO ADMIMINISTRA- TOR OF RUFUS SEWALL, DECEASED, APPELLANT, VS. THOMAS ORMAN, SURVIVING PARTNER OF ORMAN & YOUNG, APPELLEE.

1. Equity will relieve against a contract where the party complaining was greatly embarrassed, and the opposite party availed himself of that embarrassment to force a settlement favorable to himself.

2. An answer responsive to the bill denying the allegations therein, is conclusive upon that question, unless overcome by the testimony of two witnesses, or of one, with corroborating circumstances.

3. It is well settled that a suppression of truth, or suggestion of what is not true, in some material point, will be ground for setting aside any contract. Again, concealment of a material fact by a party to a contract is ground for relief, where he had better opportunity to know than the other; but where the facts lie equally open to the vendor and vendee, with equal opportunity of examination, and the vendee undertakes to examine for himself without relying upon the vendor's statements, it is no evidence of fraud that the vendor knew facts not known to the vendee, and does not make them known to him.

4. A misrepresentation by a vendor to be ground for a recision of the contract, must be in reference to some material thing unknown to the vendee, either from not having examined or from want of opportunity to be informed, or from entire confidence reposed in the vendor, and his remedy must be pursued in good time after the injury is discovered.

5. If a partner who exclusively superintends the business and accounts of the concern, should, by concealment of the true state of the accounts and busi-

2

ness, sell his share of the assets of the firm to a co-partner for a dispropor-tionate price, by means of such concealment, the purchase will be held void.

6. The qualifications suited to cases of extraordinary nature to these general rules, as laid down in White vs. Walker, 5 Florida, 479, considered and af-firmed.

7. It is a well established principle in equity that nothing but what is plainly injurious to good faith ought to be considered as a fraud sufficient to impeach a contract.

8. If a partner continue to trade with the joint property after dissolution of the partnership, he must account for the profits, and if it was continued by express or implied consent after the period fixed by the articles of agree-ment, in such case the stipulations of the original will be considered those of the continuing partnership, and it is then a partnership at will.

9. The mere fact that an agreement is improvident, is no ground for setting it aside; it can only be avoided because of surprise, or mistake, want of free-dom, undue influence, the suggestion of falsehood or the suppression of truth.

10. Before a dissolution, partners are joint tenants of the partnership property, each of them having an interest in the entire possession, as well as of every parcel as of the whole, and without survivorship, each partner embracing the character of both principal and agent. *After* a dissolution, each partner becomes a trustee for the others as to the partnership funds in his hands, in order to effect a fair settlement and just retribution of the effects.

11. In cases of mutual mistake, going to the essence of the contract, equity will often relieve, however innocent the parties may be, by correcting the error.

This case was decided at Tallahassee.

*T. Baltzell* for appellant.

In the division of the assets of the firm of O. & Young, they received $17,778 or $8,889 each. Sewall, the dormant partner, $8,527—$262 less.

By the partnership articles the firm was to last two years to the 7th of March, 1828. Then O. & Y. closed the con-cern, excluding Sewall, and took the entire stock of goods, capital and means, creating a new firm. P. 46, 48, 57.

They continued business to the 14th January, 1829, when a division of the assets of the first firm was had. P. 84.

The firm was indebted to Sewall in the sum of $22,021.76, and also to merchants in New Orleans and New York,

amounting to $3,584, which by the agreement of the division he assumed to pay. For his share and in payment of these debts, he received $9,615 of notes, $15,697 in open account, the remainder in corn, pork, mules, goods, &c., making an aggregate of $38,410.

O. & Y. took their share in notes, bearing 50, 25, 10 and 15 per cent. interest. $10,000 proved to be worth 25 per cent. more than an equal amount of the assets received by Sewall. P. 59, 29.

In the division and estimates, allowance was made in the sums due to Sewall, for interest, commissions or difference of exchange. And. Rep., 93.

By the articles of partnership, Sewall was to aid in purchasing, or to purchase, accept or have accepted by Moses Sewall, all sums that may be deemed necessary for conducting the business, not exceeding $4,000 at a time. P. 83.

He was entitled to interest on his share after ascertaining amount of nett profits.

In case of advances he was to receive 2 per cent. a month until all such sums were refunded. P. 84.

Orman & Young were to close the business *without charge*. P. 84.

When the partnership was formed, O. & Y. gave their notes for the old stock, agreeing to pay 15 per cent. interest if the notes were not paid 30 days after maturity ; $4,500 of these were due and subject to this claim.

In the division made, it is insisted there was irregularity and loss to Sewall, in this :

1st. No commissions for advances.

2nd. No commissions for acceptances.

3rd. Interest on $4,500 of stock notes at 15 per cent. as agreed.

4th. He did not get a fair proportion of the latter and more valuable notes.

5th. He did not get a share of the profits of the new firm admitted to have been prosperous.   Ans. p. 22, p. 37, mar. ; 48, 49, 50, mar.

6th. He received no allowance for collecting notes, &c., selling their assets, paying debts, winding up the concern. P. 89, mar.

7th. He did not get interest after his share was ascertained.   Otherwise stated—

Orman & Young obtained for their share in notes, each, ............. ........................... $8,627

In addition assets above par value, ................ 2,500
Relieved from collecting $38,900 assets, .......... 3,898
Pay no commission for advances, &c., ............. 4,200
Don't pay the interest on their own notes, ........ 751
Pay no profits of new firm, .................... 6,190
No commission for acceptances nor the items excepted to by auditors, ............................ 900
Sewall got ....................... .............. $8,382

Lost his commission for advances, ................ 4,200
Lost his commission for acceptances, ............
Lost his interest on accounts .................., 751
Lost his proportion of better notes, ................ 833
Lost share of profits new firm, .................... 3,595
Was at expense of collecting $39,500 assets. ........ 3,890
Lost items excepted to, ......................... 900

The means by which such a result was attained are fully set forth in the record.   O. & Y. had the stock of goods and all the assets in possession to wind up and close the concern, Sewall being a merchant in Mobile.   Instead of proceeding with this duty they started a new firm, taking stock accounts, notes, &c., and everything to themselves, indebted to Sewall $20,000 and upwards, to N. O. and N. Y. merchants only $3,500 ; they don't pay either, with near $60,-

000 of assets.   There were $15,597 of accounts, $27,396 of notes, goods, store houses, negroes, mules, corn, fodder, pork, gin houses, &c.; none of these are sold, none of the accounts turned to notes; no efforts made by suit or otherwise, to realize upon the assets of the firm.   It is all made the property of the new firm.   Sewall alleges that he offered to take good notes for the $20,000 due him—a proffer they should have made without any demand, and which was due to his necessitous condition.

He presented his account for settlement in April, and again in December.   The cold and heartless reply was that it was "incorrect and totally inadmissible, abounding in errors and false charges."   Again, that "he was neither entitled to a settlement nor to payment until March, 1829."   He applied for part of his debt in April and December;   "they tell him the business was not settled" in December; that the affairs had not been brought to a close.   They had not an amount sufficient to pay him acceptances.   "Another excuse was that he had not certain notes to give up."   B. def'dts, p. 46, the falsity of which is disproved that the notes constituted but a portion of his debt.   But the allegation of the want of funds is disproved by their letter to Tuggard stating their favorable business, making large engagements, and the highly prosperous state of their new firm, showing that all the cash was devoted to it and could not be spared to pay debts.   Ans. 22 ; Barr. def'dts, 49 ; Tuggard's Letter, 36.

He urges that the business was so large, extensive, that he could not acquire full and adequate knowledge of it ; that he relied upon the estimate of Orman, which he found to be false, erroneous and imperfect.

How in two short visits a stranger could have informed himself as to such a concern so as to make a bargain and be

in a position of equality in the making of it with O. & Y., is not perceived ; the thing was impossible.

He charges that he was imposed upon by an estimate of Orman ; that he was ignorant of the affairs and could not obtain the information. In reply they say and deny that " the estimate was submitted as accurate " by Orman, that it was drawn up for his own information, *hastily drawn up*, p. 21. A statement approaching to any thing *like correctness was not attempted ;* they *did not pretend to accuracy or positive statement* ; " it was not intended to be accurate," it was impossible to arrive at *accuracy*, nor did they *pretend* to such thing ; it was *not submitted as a correct statement.* In the hurry it was made, it was probable it contained *many errors*, and was a *rough estimate of the aggregate* amount, and perhaps to be no more, p. 27.

Now, considering that they had taken stock and an account of the notes and accounts on the 7th of March, 1828, with a view to purchase ; that it was their duty to close as soon as possible ; that ten months of the time had elapsed, why this inaccuracy, this impossibility of arriving at an accurate result ? Where the necessity of hurry ? If unable to give correct information, how could they make a fair bargain ? But again, after leaving Webbville in April, Sewall leaves for Maine, and writes to Mr. Bower to act in connection with Judge Webb as his agent ; to this a reply is made that " *Orman protested against making* a *settlement with any one but yourself*," that is, Sewall, p. 50, mar.

It is insisted again and again, that this was " a bargain and sale, a lumping and general sale." We insist that Sewall was entitled to a partition, and that O. & Y. could not sell him his own, and that he got less than his own. He got more than his own ; that it is preposterous to say that they occupied the relation of vendors, or Sewall that of purchaser. Sewall was the owner of his share and entitled to

possession as such of the part belonging to him, the one-third after paying debts. Sell him 'his own goods, notes, accounts! his own property! It is by assuming this false position that the conduct of Orman & Young alone is in any degree defensible. They produce the insolvency of Sewall by refusing to pay the $20,000 due him; they increase his anxiety to get possession of this debt and his share by refusing to pay, holding him off, treat him not as a partner but an outside purchaser, until his patience is exhausted, then make a bargain giving him vastly less than he was entitled to and themselves vastly more; throw upon him the winding up of the concern, payment of the debts, collection of the assets especially, and vast amount of open accounts; take better assets, give him the worst; take notes bearing large interest, better than cash, notes drawing 25 and 50 per cent. interest; give him accounts, old goods, &c. Take all the profits of the new concern made from his capital, his goods, stores, &c., refuse him all participation, refuse him payment for commission, for acceptances, advances and interest on stock notes, present false estimates and statements as the basis of trade, and insist he was well informed, although they set up an excuse themselves that the books were not posted, and accuracy could not be obtained. That a bargain so unfairly made should be set aside, we have the fullest conviction.

"Partners are joint tenants having an interest in and entire possession, as well of every part as the whole." Story, part 21, 121.

"The contract has a valid foundation in the mutual respect, confidence and belief, in the entire integrity of each partner and his sincere devotion to the business and true interest of the partnership."—*Ibid*, 261, § 169.

The necessity of good faith is enlarged upon.—*Ibid*, 264.

Rules as to trustees apply to partners. 1 Story Eq., §323 ; 1 San., 89; 8 Price, 127.

Utmost good faith. 9 Gratt., 204 ; 2 R. I., 298.

Bound to give full statement. 4 San., 11 ; 3 Md., 295 ; 13 Ill., 298.

In case of dissolution the effects to be reduced to money. Gow., 260.

Nor can one take stock at the cost, though custom approve it. 7 Con., 11 ; 4 San., 11 ; 9 Paige, 178.

Partners continuing business on joint capital responsible for profits to the secluded partner. 3 Kent's Com., 64 ; 1 John. Chan., 306 ; Gow. part. 255, 592.

A partner releases to his partner, does not transfer by bill of sale. Walk. Con., 89–'94 ; 15 Law Lib.

Fraud is any kind of artifice by which another is deceived. All comprise trick, cunning, dissembling or unfair advantage. 1 Mad., 255.

Unfair advantage—one party in the power of another—confidence abused—if inadequacy of price, undue influence or control, so that the parties did not treat on equal terms, the least scintilla of fraud—taking advantage of the distress of a party—of his necessitous condition to make an unequal contract—a bargain unfairly made under the circumstances. Par. on Cont., 93, 6, 7, 9 ; New. on Cont., 570–'60; 9 Pick.

It is not necessary for complainant to show advantage as the other side is to prove good faith. 10 Vesey, 393 ; 6 Vesey, 278 ; 3 Vesey, 740.

The evidence, accounts and exceptions being all in the record, the Court can determine the matter. 5 Cr., 313 ; 3 How., S. C., 333, 7 do., 220, 267 ; White vs. Walker, 5 Fla., 481.

*Papy* on same side.

FORWARD, J., delivered the opinion of the Court.

This case in extenso, was before this Court at a term thereof, held in 1860, and a full history will be seen by reference to the report thereof, found in 9 Florida, page 23. This Court then adjudged and ordered the cross bill to be re-instated, the judgment of the Court below sustaining the plea of estoppel vacated, and remanded the cause to enquire from the proofs taken or to be taken, whether the relief prayed for in said cross bill should be granted.

It appears from the record at present before the Court, that replication to the answer of cross bill was subsequently filed, and the cause in its various branches set down for hearing; that afterwards, to wit: on the 4th day of March, A. D. 1861, a decree was pronounced by the Court in the words and figures following, to wit:

"In Leon Circuit Court:

Thomas Orman, surviving partner of Orman & Young, vs. Samuel Stephens, Sheriff and Ex-Officio Administrator of Rufus Sewall, deceased. } Bill in Equity.

Same vs. Same................... } Supplemental Bill.

Same vs. Same ....... } Cross Bill, Plea and Answer.

"On this day came the parties in the above causes, and the judgment and decree of the Supreme Court of Florida passed and entered at its January Term, 1860, being exhibited, whereby the judgment and decree of Jackson Circuit Court, setting as a Court of equity, passed and entered on the 9th May, 1846, was reversed, the cross bill re-instated, and the said causes remanded to the said Circuit Court of Jackson county for further proceedings; and it further appearing that these causes were, by an order of the Judge of the Circuit Court of Jackson county, removed and transferred to the Circuit Court of Leon county, and that they

3

have been entered upon the docket of said Court, said causes were this day heard together, and were argued by counsel. Whereupon on consideration, the Court doth adjudge, order and decree that the plea to the cross bill be overruled, and the causes being then heard upon the bills, answers, report of auditors, exhibits and proofs, the Court doth adjudge, order and decree that the relief prayed in for said cross bill be refused.

"It is further adjudged, ordered and decreed, that the assignment made by Orman & Young to Rufus Sewall, by deed of indenture, executed on the 14th January, be valid and binding upon the parties. It is further adjudged, ordered and decreed that the bond of indemnity executed by Rufus Sewall and E. J. Bower be valid and binding upon the parties; said bond of indemnity bears date the 14th January, 1829, and is executed to Orman & Young, and that the obligations, covenants and conditions therein contained be specifically performed by the said Samuel Stephens, ex-officio Administrator of Rufus Sewall, deceased, out of the assets in his hands to be administered. It is further adjudged, ordered and decreed, that it be referred to Hugh Archer, Esq., Master in Chancery, to ascertain and tax the damages sustained by the said Thomas Orman, surviving partner of Orman & Young, by reason of the failure of said Rufus Sewall in his life time to fulfil and perform the obligations, covenants and conditions in said bond of indemnity contained, and that he report to this Court without unnecessary delay in order to a final decree."

The cause now comes to this Court on an appeal from this decree.

The errors set forth in the petition of appeal are:

1st. "That complainant Orman was not entitled to any decree of any kind, but his bill should have been dismissed for want of merits, and as being founded in fraud and the

grossest oppression, and because in truth and justice he is entitled to nothing from Sewall or his Administrator.

2nd. "Complainant (Sewall) is, upon the principles of right and justice, most clearly entitled to relief to have the contract rescinded, the bond set aside, and a decree for a large sum of money against Orman. That he is entitled to this on account of the superior assets received on account of extra interest, advances, commissions of 2 per cent. for winding up affairs of the partnership, and his portion of the new firm."

To a proper understanding of matters in issue, it becomes necessary to set forth in substance the allegations in said cross bill, and the answer thereto. The cross bill alleges that on the 5th March, 1826, the said Sewall and Orman & Young entered into a partnership, (see articles of agreement, 9 Fla. 23;) as per agreement the said Sewall transferred to the firm of Orman & Young the stock of merchandize then belonging to him, which really belonged to the firm of William Hitchings & Company, their store-houses, ware-houses, out houses, &c., of the value of $9,508.09, and afterwards made advances to and procured acceptances, paid their drafts, &c., amounting to nearly $40,000, as will appear by his account filed therewith, and marked Exhibit E., No. 5.

It further avers, that after the said Sewall, Orman & Young had carried on business for nearly three years, under the articles of co-partnership, (see 9 Florida, page 24,) he the said Sewall, through misfortune became deranged in his affairs in Mobile, and was compelled through necessity to look elsewhere for means; that as the firm of Orman & Young had been prosperous in business, and were also indebted to him in a large amount for advances, he left Mobile, where he had, during the existence of the firm and up to that time resided, and came to Florida that he might receive the por-

tion that was coming to him from the concern. That the business of the firm was mostly conducted by Orman & Young, and that he (Sewall) was a silent partner, residing in Mobile, knew but little of the concerns of said firm, and was almost entirely ignorant of their property, the character of their debts, the amount and the prospect of their collection. From the books he could get but little information, as the business was of long standing and intricate, and satisfactory knowledge in that respect could only be acquired by long and laborious engagement in the business itself. Said Sewall further avers in his said cross bill, that he at first applied to said Orman & Young, (as the time fixed for the expiration of the partnership had elapsed many months,) for the portion that was coming to him from the concern, and was told that their affairs were not adjusted, and that a division could not be made at that time, so as to allow him any thing. He next applied to them for payment of the amount due him for advances made to the firm, which amounted to about the sum of $20,000 ; but this was also refused, on the ground that they had no money. He then proffered to take it in good notes, such as were due them, and this they refused. That his pressing necessities being well known to the said Orman & Young, his late copartners, they determined to make the most of his situation, turned a deaf ear to every proposal he made; that said Orman & Young made an estimate in writing of the business affairs of the firm, which estimate was in the hand writing of said Orman, which they submitted to him, said Sewall, as a correct statement, as near as could be, of their transactions.

The cross bill further alleges that on furnishing this statement, the said Orman & Young proposed to sell their interest of the firm to said Sewall for $17,500, they, said Orman & Young, in payment thereof, to have choice of paper to the

amount of $17,500; that finding all his efforts unavailing at a fair settlement, pressed by his wants and the peculiarity of his situation, he was compelled to accept their said proposition; and that said Orman & Young took to the amount of $17,500 the best of said paper, and such as bore interest at the rate of 15, 20 and 50 per cent. Said Sewall further avers in his said cross bill, that it was on this statement made out in the hand writing of Orman that he acted, and confiding in it, he was induced to accept the offer made by them, and alleges that they had the books in their own possession, had made all or nearly all the entries, were personally acquainted with every transaction of the firm, and must have known the true state of their concern.

The cross bill further avers that after some time he discovered from an examination of the books that he had been grossly imposed on; that the statement made out and handed him by said Orman & Young was incorrect and contained palpable misstatements. The cross bill charges that the notes were set down in said estimate at $28,400, and a list thereof accompanied said statement, which is described as being marked C. No. 3.

The complainant in the cross bill here sets forth the following errors which he has discovered in the list of notes, to his prejudice:

1. That only $275.53 were due from James Webb, instead of $769.47 as represented.

2. That only $757.63 were due from Sears Bryan, instead of $835.84 as represented.

3. That only $54.98 were due from Richard L. Watson, instead of $93.75 as represented.

4. That only $55.27 were due from Sion Smith & Joseph Russ, instead of $816 as represented.

5. That only $242 were due from John Register, instead of $536.80 as represented.

6. That only $17.50 were due from Wm. Evans, instead of $18.40 as represented.

7. That only $95 were due from Graham & Pope, instead of $110.80 as represented.

8. That only $16.70 were due from Thomas Nalls, instead of $26.70.

9. That only $1,192.10 were due from Brown & Lott, instead of $1,342.10 as represented.

10. That two notes were included in said list from Sims & Murphey for $200, which ought not to have been there.

11. That two notes of J. B. Bryan and Thomas M. Bush were included in said list, which in justice ought not to have been there.

12. That Benjamin Hays' note for $50 was not delivered to the complainant by the said Orman & Young. That the above mentioned notes were subject to credits which were not disclosed nor made known to said Sewall, making the differences as stated amount in aggregate to $2,013.15.

13. That the accounts of the firm were represented at $16,600, when they were only $13,717.50, including the accounts at the Bay and the memorandum book accounts, which were not included in the estimate, making an error in this respect of nearly $4,000.

14. That the goods on hand were put down at $7,000, when it should have been but $6,000.

15. That the cotton on hand was represented to be worth $4,000, when it was worth only $2,559.96.

16. That corn, pork, &c., was estimated at $1,000, when it should have been $800, making a difference of $200 in that item.

17. That two negro boys were put down at $900, which were purchased for $460.

18. That the debts owing by the firm were put down to $24,000, a much smaller sum than was actually owing.

19. That the debts of said firm in Jackson county and bad ones, were improperly rated at $5,000, when they exceed that sum.

Attached to the cross bill, it is averred is an exhibit marked II, No. 8, setting forth a statement of the difference between the said estimate exhibited to said Sewall by said Orman & Young, and what he said Sewall considers a true state of the concern at the time settlement was made. The cross bill further alleges that shortly after said settlement, the said Orman & Young, perceiving errors in their favor, brought them to the notice of him, Sewall, for correction, and he, Sewall, acceded to them, but that when he, Sewall, required an adjustment of the numerous errors committed to his prejudice as aforesaid, they refused. The cross bill requires the defendants to answer the allegations thereof, and prays that the said agreement entered into (see 9 Florida, page 28,) between the said Sewall and said Orman & Young, for the adjustment of their partnership concern, be set aside and held for naught, and the bond given by said Sewall and said Bower to said Orman & Young be annulled and given up, and an account taken, or that the errors and mistakes, &c., committed by the said Orman & Young in their said estimate and representations be corrected.

To this cross bill, the defendants Orman & Young, on the 18th December, 1830, plead to part and answer to the residue. As the plea has been overruled and no question arises under it before this Court, it is unnecessary to set it forth. The said Orman & Young, in answering, say, that in December, 1828, the said Sewall did come to Florida, with a view, as they then supposed, to a settlement of all matters and things of a commercial nature between them; that the mercantile business of Orman & Young, previous to 7th March, 1828, and also that since that date, was not in such a condition as to admit of a statement approaching to any thing

like correctness, nor was it attempted; that said Sewall commenced by asking for a settlement, and exhibited an account, which upon examination, the said Orman & Young found to be incorrect in various matters and to a large amount; that the said Sewall then commenced negotiating for a sale or purchase, and made various propositions to them separately. They further answering say, that eventually the said Sewall made the proposition to purchase their interests for said $17,500 on the terms set forth in the bond.

The said Orman & Young positively deny that any estimate or statement was submitted by them to said Sewall as accurate or correct, showing the condition of their business, or that he was informed by them that the estimates or statements referred to in his bill were accurate. Thomas Orman avers that the statement made out by him was made out for his own information, and not with a view to direct or govern the said Sewall in his conduct. Andrew Young says he knew nothing of them until he saw them in the store on his arrival from the bay, and that he objected to Sewall's having them, as they were then negotiating.

The defendants Orman & Young further say in their answer that said Sewall enquired for himself, examined the books, and had access to them when he wished; that all calculations and estimates were general; that no trick or concealment was used to induce said Sewall to purchase, &c. They further aver that the business was carried between them in the way of bargain and sale, in which for an aggregate amount they sold the aggregate of the co-partnership property, on which sale, a balance of each member's share of the concern was not attempted to be ascertained.

An amended answer to said cross bill was put in at June Term, 1831.

This answer admits the origin of the partnership as alleged in cross bill and articles of agreement, and also ad-

mits that Exhibit E, No. 5, is a correct statement of the stock, houses, &c., transferred to them by said Sewall, and it alleges that the same statement shows that the said Orman & Young gave their notes for the amounts, and they aver that said notes were to bear interest at the rate of six per cent. after the seventh day of March, 1827, and at the rate of fifteen per cent. if not paid within thirty days after due. The said defendants deny the correctness of the accounts marked Exhibit E, and expressly state that they abound in errors and false charges. The answer further avers that similar accounts were exhibited to them in December, 1828, and January, 1829, whilst negotiating a settlement of the concern, and that they at that time distinctly informed said Sewall that they were not correct, and would not be admitted. The answer further sets forth that the accounts between said Sewall and the firm vacillated; sometimes they were greatly in advance to him, and that they were not indebted to him in any considerable amount, until the latter part of the year, 1828, and this was on account of his acceptances for goods purchased the last of the year 1827, which principally became due in the year 1828. They deny in their said answer that said Sewall had a right to demand payment or settlement of the partnership in December, 1828, as he in his cross bill alleges, and aver that by the articles of co-partnership, it is expressly provided said profits were not payable until March, 1829. They further allege in their answer that in April, 1828, the said Sewall came to Chipola, and then proposed to take for his interest six thousand dollars; that they offered him five thousand dollars, and one of them, Andrew Young, offered to take the last sum for his interest; that these propositions were rejected mutually. The defendants further aver in their said answer that when said Sewall was there in said April, he was in-

4

formed by them that the old stock on hand to the 7th
March, 1828, had been taken by them at cost, and that to
this he then made no objection.   The said Orman & Young
most positively deny that it was with a view of making the
most of said Sewall's necessities that a settlement and pay-
ment was not made in said December to him; on the con-
trary, they aver that the affairs of the old firm had not been
brought to a close, so that his share could not be ascertained,
nor had the time arrived when his share was payable, and
that they had not made collections sufficient to pay off the
amount due him on account of acceptances.   And they deny
that any proposition, within their recollection, was made
by said Sewall to take notes for the amount due him, Sewall.
They admit he made several propositions, but say none of
his propositions were acceded to until he made the one set
forth in the bond, and finally agreed to ; and they deny that
this last mentioned proposition of $17,500 for the joint in-
terest of Orman & Young, was made by them as stated in
said cross bill, and aver it was the proposition of said Sewall
made to them ; and this, too, after the said Sewall had had
sufficient time and opportunity of informing himself as to
the condition and situation of the business.   They aver that
the said Sewall had access at all times to the books, consulted
with the clerk of the store, E. J. Bower, who had lived with
them from 1826 to December, 1828, and was their principal
book-keeper.   The answer further avers that during said ne-
gotiation, various estimates were made both by them and by
said Sewall, and that in none of them did they pretend to
accuracy or positive statement ; that it was (owing to the
manner they conducted business) impossible to arrive at ac-
curacy or positive statement, and this they aver was well
known to said Sewall, who inquired for himself and acted
upon his own information.   And the said Orman & Young
deny that the statement mentioned in complainant's bill,

charged to be in the handwriting of said Orman, was submitted by them to said Sewall as a correct statement of the affairs of the said firm; on the contrary, they say it was a "*rough estimate of the aggregate amount,*" made for their own information, and deny that said Sewall acted upon it as a correct statement.

Further answering they say, 1st. That so far as relates to the several errors and deficiences pointed out and specially charged in the cross bill, as far as they recollect, or believe, said Sewall was apprised that James Webb was entitled to a credit for corn and cotton, which they believe was entered on the books about the first of January, 1829

2d. That the errors charged in Sears Bryan's account will be explained by adding thereto the account of Bryan & Marshall, included therein.

3d. That Watson was credited on his note while the trade was negotiating.

4th. That the amount due from Sion Smith and Joseph Russ was by note for $400, dated 23d December, 1826, due one day after date, drawing interest at the rate of fifty per cent. per annum, till paid, and they aver that said Sewall was informed and knew previous to said agreement that said Russ had delivered 28 or 30,000 lbs. seed cotton, which he insisted should be credited on the note as per agreement claimed by said Russ to have been made with said Andrew Young, but which agreement was denied by said Young, said Young claiming that the cotton should be credited on an open account on the books due and owing the firm by said Russ.

5th. They further say that the claim against John Register was in a judgment in Alabama, which judgment, by miscalculation of the Attorney, had been taken for too much, and they aver this was at the time of said agreement explained to and known by the said Sewall.

6th In regard to Evans' note they say they have no recollection, but that the books will show correct amount.

7th. The debt against Graham & Pope they say, was originally a judgment for $93, and that the interest up to the time of the agreement would be the amount stated.

8th. That Thomas Nall had done some work for the firm, and, if not otherwise settled, was entitled to a credit therefor.

9th. That a draft had been drawn on Brown & Lott for $50, in favor of E. Chambless, after the estimate and before the sale; that they had no recollection of any other credit to which they were entitled.

10th. The notes of Sims and Murphy they say, were obtained before the sale to complainant, and were with the sale transferred to him.

11th. The notes of T. M. Bush and J. B. Bryan they say, were for the hire of the negroes of the firm, and which they say said Sewall knew at the time.

12th. They admit that Benjamin Hayes' note was not delivered to said Sewall, and allege it was because they, the said Orman & Young, took it as part of the $17,500 purchase money.

13th. In regard to the aggregate or sum total of open accounts, as stated in said estimate, they say, the said Sewall did not rely upon that statement as accurate; that it was made out in haste, the books being behind hand, and was not made out for the information of Sewall, but for themselves, and deny that there was any imposition upon the said Sewall intended. They also deny that it was the understanding that the amount of accounts at St. Andrew's Bay, and memoranda accounts, should be or was excluded in said general statement.

15th. In relation to the cotton, the say the books did not show the amount or cost of the cotton; it was dispersed

throughout the country, at different gins and in course of delivery; that the estimate was not intended or understood by the parties to be accurate; that they believe said Sewall received one hundred and thirty bales thereof, which were shipped from St. Andrew's Bay.

16th. The corn and fodder they say was estimated at its value at the time of sale, and as a gross estimate it is believed to be nearly correct.

17th. They admit the two negroes were purchased at the sum of $460 as alleged in the cross bill and they were in said statement estimated at $900, but avers that the negroes were worth the nine hundred dollars to the firm, and said Sewall did not object to giving that sum.

The answer to said specific charges further states, that they stated to said Sewall all the debts due from the firm as far as they were known to them and recollected.

The said Orman & Young deny that the debts of said firm in Jackson county were improperly rated at $5,000, for bad and doubtful debts, and aver that they have no doubt that sum was abundant to cover all losses and errors.

The answer admits that there was a small account of errors on both sides, and said Sewall was called on to adjust them.

And the said Orman & Young in their said answer positively and expressly deny all manner of fraud, and imposition and deceit, charged against them in said cross bill.

The following is the testimony in the case, viz:

Testimony of William Taggard, of the firm of William Taggard & Co., witness for Orman & Young, taken 30th October, 1830:

1st. Do you know the parties?

Ans. To the first interrogatory he answers and says, that he knows the plaintiffs and the defendant Sewall, but that he has no personal acquaintance with the defendant Bower.

2d. Were the plaintiffs Orman & Young indebted to you on the 14th January, 1829? if so, state the amount they owed you, or the firm of which you are a partner, and state the amount due you previous to the shipment by the schooner Carroll; if anything be claimed on account of said shipment?

Ans. The plaintiffs, Orman & Young, were indebted to the firm of William Taggard & Co., of which deponent is a member, on the 14th of January, 1829, in the sum of fifteen hundred and eighty-four dollars, or thereabouts, of which amount four hundred and thirty-four dollars, or thereabouts, was due previous to the shipment of the schooner Carroll, and the balance of said amount, viz: eleven hundred and fifty-four dollars, or thereabouts, was due on account of said shipment.

3d. If anything was due you at the above date, state if the same has not been paid, or some part, and what part?

Ans. Nothing has been paid by the said parties on account of said debt, but that this deponent has received from insurance companies nine hundred and sixty dollars, or thereabouts, on account of losses on shipments by the schooner Carroll, which shipments were made on account of Orman & Young, to deponent's information and belief.

4th. Was the amount due by said firm assumed by any one, and if by Sewall, did you receive his letters to that effect? if so, annex the original, or, if that be lost, a copy, and state date, &c.

Ans. At the time of contracting the whole debt due deponent, the defendant, Sewall, was a partner in the house of Orman & Young, and deponent looked to said firm for payment of his debt; that this deponent, in the latter part of 1828, or the early part of 1829, sometime after the debt due deponent, on the 14th of January, 1829, was contracted, received a letter from the defendant Sewall, stating that he

had arranged matters with Orman & Young, and had taken the business into his own hands, but containing nothing in particular in reference to the debt of deponent; that deponent is unable at present to lay his hands on said letter, and has no copy.

5th. If any part of said demand has been paid, please state who has paid it, and at what time the same was paid, and to what part of the demand you applied the payment ?

Ans. Nothing has been paid, and nothing received on account of deponent's debt, except the amount stated above as received from the underwriters, which has been received within a few weeks past, and has been credited by the deponent to the account of the shipment by the schooner Carroll.

Testimony of Charles A. Sewall, taken 24th August, 1831 :

1st. Was you in New York in October, 1828, purchasing goods ?

Ans. I was.

2d. Was you personally acquainted with Mr. Taggard of the house of William Taggard & Co., merchants of New York ?

Ans. I was.

3d. Did you know of an order or memorandum sent William Taggard & Co., by Orman & Young, for a quantity of goods ? if yea, state the circumstances.

Ans. While in New York I heard William Taggard, of the house of William Taggard & Co., observe to Rufus Sewall, "I have received an order from Orman & Young, enclosing a memorandum of goods which they wish me to purchase. . I have no funds of theirs now in my hands, and you can take the order and make the purchase." And to my knowledge, Rufus Sewall did make purchases of the order.

4th. Were the goods thus purchased shipped by the schooner Carroll, and was the cargo of said schooner abandoned to the underwriters?

Ans. The goods thus purchased were shipped on board the schooner Carroll, which vessel, meeting with some disasters out, I deemed it prudent to abandon my interest to the underwriters, and Rufus Sewall likewise abandoned the interest of Orman & Young.

5th. Is the annexed statement of $957.41, the balance due Rufus Sewall on the transaction, and the account of William Taggard & Co., which is likewise hereunto annexed, to the best of your knowledge correct? viz:

Messrs. Orman & Young,

To Rufus Sewall, Dr.

October, 1828, for merchandize purchased in New
York of C. & O. Waddel,..................... $ 664.80
Of Wm. Bryan,.............................. 312.28
Of Spear, Carlitor & Co.,................... 904.29
Of J. & L. Brewster,........................ 245.69

$2,127.06
1,169.65

Interest on balance, 12th May,............... $ 957.41

Messrs. Orman & Young,

To Wm. Taggard & Co., New York, Dr.

October, 1828, for my acceptance for merchandise, purchased as per your order of Brown &
Humphreys,................................. $ 226.69
Of Wm. B. Corgro,......................... 291.30
Of Wm. Todd,.............................. 259.32
Of Blackwell & McFarlan.................... 259.32

$1,042.52

Stephens vs. Orman.—Opinion of Court.

Amount brought forward, ....................$1,042.52

967.63

$ 74.89

Ans. To the best of my knowledge the statement of both accounts is correct, but I know nothing respecting the charge of commissions and interest, which I think ought to be made.

6th. Did you not consider Rufus Sewall as the principal of the concern of Orman & Young ?

Ans. I did.

7th. Is the annexed a correct extract from a letter written by William Taggard & Co., to Rufus Sewall ?

(Remark by the Court; this extract referred to is not found in the record.)

Ans. It is.

Testimony of Addison Mandell, a witness for Orman & Young, taken before Commissioners, 22d June, 1831 :

Interrogatory. Please state whether you had for collection a debt against complainants in favor of Florence & Co., and if you applied to defendant for payment, and what was his answer, and state the time ?

Ans. He had a demand in his hand in favor of J. L. Florence, for five hundred and some odd dollars, against the plaintiffs, upon which suit was brought and money collected. At the time he called upon Mr. Orman, one of the firm, he informed him that it was to be paid by Sewall. He afterwards on the same day saw Sewall, who stated he was to pay it, but Orman & Young had not acted right with him and he should not do it; they might pay it, and he would have the use of the money until it could be collected : the time was May, 1829, or shortly thereafter, but not later than June.

5

Testimony of William J. Watson, a witness for Orman & Young, taken before Commissioners, 22d June, 1831 :

Interrogatory. Did defendant purchase of you a tract of land? if so, state with what funds you were paid, and describe the land.

Ans. Rufus Sewall purchased from him the South-west quarter of Section five, the North-west quarter of Section eight, the East half of the North-east quarter of Section six, the East half of the South-east quarter of Section six, all of Township five, Range eleven, N. and W., for which the said Sewall gave between twenty-eight hundred and three thousand dollars. Five or six hundred dollars, as this deponent believes was paid in cash, and his own paper due to Orman & Young, the balance was paid in notes and accounts due to and given to Orman & Young. This deponent does not recollect the precise amount of the notes he received, but according to contract they were selected from the debts due to the late firm of Orman & Young.

Testimony of Ebenezer J. Bower, taken before Commissioners at the instance of Orman & Young, on the 20th June, 1831.

Interrogatory. 1st. Do you know of the trade between the above parties in relation to the stock of goods, and sold by the complainants to defendant? if you do, please state, 1st. Whether defendant frequently counselled and advised with you in relation to the trade, in relation to the general character of the debtors, and the value of the concern in the aggregate.

Ans. I do know of the trade between Orman & Young and Rufus Sewall, for a stock of goods and a quantity of other property, to a large amount. The goods were estimated in the statement hereunto annexed, in the handwriting of Rufus Sewall, at six thousand dollars, though I believe they were estimated by Orman & Young at seven

thousand dollars. The same goods were afterwards included in the concern of Bower & Sewall, at six thousand five hundred dollars. Said Sewall frequently advised and consulted with me on the subject of the trade while it was negotiating, and on particulars about which he seemed doubtful, and on the general character of the debts due to the concern, but not (as I recollect,) as to the aggregate value of the whole concern.

2d. Did you consider the trade as a lumping one, or as a trade for specific articles, and state what was defendant's view of it, so far as you could judge by his words and general conduct whilst the trade was negotiating, and at the time?

Ans. I considered the trade a lumping and general one, and not of specific articles; no inventory was taken of the goods. Said Sewall was evidently dissatisfied with the trade while it was negotiating, as he expressed to me at the time, but said it was the best he could do; that Orman & Young had a large amount of his property in their hands which he must have the control of. After the trade was consummated, he seemed to be better satisfied.

3d. Please state, and particularly describe the property received by Sewall from complainants, viz: The land and negroes each, what belonged to the firm of Orman & Young, as all subsequently acquired with the funds and debts, and means of the firm?

Ans. The property sold by plaintiffs to defendant consisted of a stock of goods, (before described,) a lot of land adjoining Webbville—ten or fifteen acres—on which stood a cotton gin house and several other log houses; also a quantity of corn, bacon, cotton, two negro boys, one negro man, one negro woman and child, two or three horses and mules, a storehouse in Webbville, a store and warehouse at St. Andrew's Bay, besides a large amount of notes, accounts and

other valuable papers. There was subsequently purchased
with the funds, debts and property of Orman & Young, the
following property, viz: Three quarter sections of land pur-
chased of Wm. J. Watson, valued at about three hundred
dollars; one quarter section, purchased of Thomas J. Scur-
lock; about forty acres of land purchased of Thomas J.
Russ; three quarter sections of land, eleven negroes, some
corn, bacon, horses, mules, &c., of James Webb, valued at
six thousand five hundred dollars. I am not sure that the
whole amount was paid out of the means of the concern of
Orman & Young, but am satisfied that the greater part of
it was.

4th. State whether Sewall was informed of the situation
of Thomas Russ' notes and amounts, and the judgment
against Register, and also the Russ and Smith's notes, and
state what was their situation, and if Sewall knew it?

Ans. I recollect having a conversation with said Sewall
immediately before or after the trade, (I think it was before,)
on the subject of Thomas Russ' note, and Sion Smith's and
Joseph Russ' notes for four ———— dollars, at fifty per
cent., in which I told him all I knew about it, and particu-
larly stated an understanding between said Russ and Young
in the fall preceding, about Russ' cotton, which, according
to the understanding, was to be applied to the payment of
this note. After Russ had delivered the cotton he applied to
said Orman for a receipt, which he, said Orman, wrote, and
also a note for the amount of said Russ' account, and then
said to Russ, if you will sign the note I will sign the receipt.
Russ declined signing the note, and the business ended.
Mr. Orman then attached both blank note and receipt to the
leaf of the ledger containing said Russ' account, and all re-
mained in that situation till the aforesaid trade was consum-
mated. I don't distinctly recollect of informing Mr. Sewall
the situation of the judgment against John Register. I

knew that it was rendered through mistake, for more than Orman & Young claimed, and was always under the impression that Mr. Sewall knew it. I had, previously to the trade, heard Orman observe that he only wanted the amount due.

5th. Relate all you know, which will in any way benefit complainant.

Ans. At all times when I was at the store of said Orman & Young, said Sewall had free access to all the books and papers belonging to the concern. On the 7th of March, 1828, said Orman commenced taking an inventory of the stock of goods on hand, and from that time changed their business entirely. The firm, as it had existed, was considered by the said Orman & Young to be dissolved, and Rufus Sewall was considered no longer a partner. Their partnership having expired on that day, according to their agreement, the business was afterwards kept separate and distinct from that of the old concern. Sewall was at Webbville in March or April of the same year, when he attempted to make a settlement with Orman & Young, who declined doing so, because (as they informed me,) Mr. Sewall had their notes to a large amount which he was not prepared to give up. During the time, and afterwards, when said Orman & Young were absent, I had charge of the concern. Said Sewall had free access to the books and papers, and had a fair opportunity to examine and calculate for himself. One of the letters hereunto attached is in the handwriting of Rufus Sewall, the other is my answer to the same. I was clerk for Orman & Young for about two years, during which time I never discovered anything that led me to believe that they were disposed to wrong said Sewall in the least amount. *At the time of the trade I supposed five thousand dollars were sufficient to cover all bad debts and all amounts due by said concern in Washington and Jackson counties.*

The following are the letters above referred to, as attached, viz :

HALLOWELL, 29th July, 1828.

E. J. BOWER, Esq.—*Dear Sir :* I enclose a letter to Messrs. Orman & Young, which I wish you to examine, also the agreement entered into by Orman & Young and myself, which Mr. O. will send you for inspection. Either W. or myself have made some grand error, or else I have made some mistake of Mr. O.'s meaning. I shall proceed to New York in a day or two, I will then forward you my power of attorney. I do not know but it will be well enough to constitute you and Maj. Webb my attorneys. At any rate, I only want precisely what the agreement gives. If I have wrong impressions or incorrect views, certainly unprejudiced men can determine. All O. & Y. have is now due to me, and the amount is much too large for me to lay out of. It is on this account, I think, however honest O. & Y. may be, it is very proper I should have some uninterested person or persons to look a little to my interest. I shall write you again from New York. In the meantime believe me,

Very respectfully,

RUFUS SEWALL.

| | | |
|---|---|---|
| Notes and accounts, | | $17,947.62 |
| do. do. | | 16,491.16 |
| Aug., | | 1,660.00 |
| Goods, | | 6,000.00 |
| Cotton, | | 4,000.00 |
| Gin house, | | 1,000.00 |
| Cash | | 1,000.00 |
| Gyves, | | 1,800.00 |
| | | $58,868.78 |

Bad and doubtful debts, R. S., .................$19,800.00

Amount brought forward,................$19,800.00
R. S.,.......................................  5,250.00
N. O.,.......................................  3,200.00
N. Y.,.......................................  450.00

                                     $28,700.00

Trial January 1st, 1829.

Orman & Young's indebtedness is above in this way, according to their own accounts.

                                     Dr.

One note due on the 1st February, 1828,..........$ 2,500
One note due on the 1st May, 1828,..............  1,500
One note due on the 1st April, 1829,.............  500
On demand,....................................  11,659
On demand,....................................  2,535
On demand,....................................  50
On demand,....................................  3,180
Mr. Sewall's acceptance,......................  5,200
Payment, ....................................  3,000
Received payment,............................  95
——————————,............................  15,434
My account in Boston,........................  3,200

Since in cash paid,............................$49,232

                                     Cr.

By proceeds of bales of cotton,..................$ 5,500
By proceeds of 320 bales of cotton,..............  9,497
Draft on New York,...........................  960
115 bales shipped to Liverpool,.................  4,200
164 bales shipped to New York,.................  5,200
Cash,........................................  2,000
Freight,.....................................  615

                                     $28,492

            $28,492

            26,831

Being.........................................$ 7,500

One-third profits of $28,331 is the whole business.

I only sketch to you the situation of Orman & Young's accounts with me, to show only the nature of the obligations Orman & Young stand to me. If any men are the least bound to another, it must be Orman & Young are bound to me, as strong as men can be. I have concluded to address a word to Judge Webb, only for the purpose of deciding in case any misunderstanding between you and Mr. Orman. I presume Orman & Young owe me $30,000, or, that is, that amount is due me from the concern.

Yours, etc.,     R. SEWALL.

ANSWER OF BOWER TO SEWALL.

WEBBVILLE, Sept. 10th, 1828.

*Dear Sir :* I have delayed writing you until I could see Judge Webb upon the subject of your letter, which I was not able to do until yesterday. He informed me that he was entirely ignorant of the agreement between you and O. & Y.; that he should leave here to-morrow for Key West, and should not be able to render you any service in the settlement of this business. Orman, in the meantime, has protested against making any settlement with any one but yourself, and has written you on the subject. I have no doubt of O. & Y.'s intention to do you strict justice. I will, however, as requested, attend particularly to your interest in the business.

Business has been tolerably good this summer. We have sold since the 7th March, upwards of $11,000 worth of goods. Please remember me to your brother, and tell him I shall look for him in October.

Yours sincerely,

E. J. BOWER.

Testimony of Ebenezer J. Bower, in answer to interrogatories propounded before the Auditors, 23d August, 1831 :

Interrogatory 1. Were you a clerk for Orman & Young in their store at Webbville?

Ans.   I was.

2d.  How long did you act in that capacity?

Ans.   About two years.

3d.  Did you act as salesman and principal book-keeper while you were with Orman & Young?

Ans.   I did.

4th.  Were you left for months in the entire control and discharge of the business at Webbville?

Ans.   I was.

5th.  Do you know whether the business was managed for the best interests of the concern?

Ans.   It was, as well as I could judge.

6th.  Was Orman vigilant and attentive to the business at all times; and did he have to attend to and the principal business abroad in purchasing goods, &c.

Ans.   He was, and did.

7th.  Do you or not believe that the business was well and faithfully conducted at St. Andrew's Bay by Young, except when his health was so bad that he was not able to attend to business; and then did Orman & Young have in their employ Silas Dinsmore as clerk, who assisted at St. Andrew's Bay during the illness of Young, until in December, 1827, or January, 1828?

Ans.   I do, and they did.

8th.  From all you know, was the business honestly, faithfully and correctly managed by Thomas Orman and Andrew Young, for the best interests of the concern?

Ans. It was.

9th.  Did you know either Thomas Orman or Andrew Young to make use of the money, credit, or means of the concern, in any way to effect or promote any individual transaction, or to secrete or dispose of anything that be-

6

longed to the concern that is not accounted for in their books?

Ans. I never did.

10th. Were the books of Rufus Sewall's business done at St. Andrew's Bay in 1825, and also the books of William Hitchings & Co.'s business done at St. Andrew's Bay and Webbville, in 1825 and 1826, by the purchase made of Sewall, and the accounts in them due, and the notes, judgments, &c., purchased of said Sewall, as appear by the list here shown and attached, always considered the same in relation to Orman & Young's business as any of the business of said firm, and conducted in all instances, in settlement or arrangement with individuals, precisely the same as any of their accounts, notes, judgments, &c. ?

Ans. They were.

11th. Did Orman & Young close doors and commence taking stock at Webbville on the 7th day of March, 1828, and continue until they had taken a faithful account of everything in the store, or when ?

Ans. They did.

12th. Did Orman & Young, in your presence, or did you count the cash they had on hand on the 7th day of March, 1828, and take an account of it, and also keep an account of all that was received in all business previous to the 7th March, 1828 ?

Ans. I don't recollect of counting the cash or seeing it counted, but presume it was counted by me or in my presence, as a very particular account of everything was taken at that time. A regular account was always kept of cash before, as well as since the 7th March, 1828.

13th. Was the account of stock taken at Webbville entered in a book for that purpose, and the original sheets upon which it was taken rolled up together and carefully

tied, and laid in or on the book case; and did it not remain there at the time Orman & Young sold out to Sewall?

Ans. I don't distinctly recollect on what the account of stock was first taken, but it was copied from the original in a book.

14th. Was the total amount of stock taken at St. Andrew's Bay by Young received at Webbville soon after the 7th March, 1828; and is not the account here attached, in the handwriting of Young, to the best of your knowledge and belief, the same in amount and substance that was then received?

Ans. I do not recollect seeing the inventory of stock at St. Andrew's Bay taken by Mr. Young.

15th. Did Orman & Young direct you, Mr. Bower, to take an account of all the notes, and include the interest to 7th March, 1828, and did you do it?

Ans. They did, and I did.

16th. Did Orman & Young direct you to make out the individual accounts, and take an account of all that was due them on their books at Webbville on the 7th March, 1828, and did you do it?

Ans. They did, and I did.

17th. In closing the business done previous to 7th March, 1828, did not Orman & Young direct you to keep it separate and distinct from the business they were doing after said 7th March, 1828, and did you do it, and was it not generally done?

Ans. They did, and I did, and it was.

18th. Did you understand from Orman & Young that the business done after said 7th of March, 1828, was altogether on their own account, and that, in the former business, Rufus Sewall was concerned with them?

Ans. I did.

19th. Did Orman & Young open a new set of books

throughout on resuming business, after an account of stock was taken, after the 7th day of March, 1828, and did they commence and keep a new file of notes, altogether separate and distinct from that previous to the 7th day of March, 1828?

Ans. They did.

20th. What was the amount of sales and merchandise made by Orman & Young after the 7th day of March, 1828, to the time they sold out to Rufus Sewall, and was their business better then that it had been for the same month in any previous year?

Ans. The amount of sales of merchandise, from the 7th March to August, 1828, was about eleven thousand dollars better, I think, than they had been in the same months of any previous year. The business was very good to the first of January, but I have no recollection as to the amount of sales. The merchandise account on the ledger will show the amount.

21st. Did you understand from Rufus Sewall, when he visited Webbville in April, 1828, that his object was to make a settlement with Orman & Young, and close the business of the old concern?

Ans. I did.

22d. Did you understand from Rufus Sewall, or from Orman & Young, that the reason a settlement was not then made was, that Rufus Sewall had not with him the notes of Orman & Young, and certain other documents that were necessary in effecting a final settlement, or what were the circumstances?

Ans. I did from Mr. Orman.

23d. Did you hear Orman & Young tell Rufus Sewall in their counting room in Webbville, in 1828, that, as he was not here at the time the co-partnership expired by its limitation so as to buy or sell by the parties, agreeable to the

terms of the articles of co-partnership, that they had been obliged to take the stock generally to their own account at its value, and proceed on with the business, considering him as withdrawn from the concern, and did he, (Rufus Sewall,) make any objection at that time, or did he consent?

Ans. I have no recollection of these circumstances.

24th. Did you, then, in April, 1828, hear Orman & Young and Rufus Sewall endeavoring to trade for Sewall's interest in the old concern, and did you hear Rufus Sewall offer to take for his interest in said concern, six thousand dollars, and did you hear Orman & Young offer him five thousand dollars, and, after some talk, dropped the subject and did not trade?

Ans. In April, 1828, Orman & Young and Rufus Sewall were endeavoring to trade in some way, but heard no offer or proposition, except by Mr. Sewall who made some figures, on a piece of paper and held it up to Orman & Young, and said he would give *that*, meaning, I suppose, the amount stated in figures. This took place the night after the day he arrived at Webbville, and it was the first circumstance that led me to believe that Rufus Sewall was concerned with Orman & Young.

25th. Did Orman & Young, in April, 1828, pay to Rufus Sewall two thousand dollars, as per his receipt, and did not you let him have of money that was collected during Orman's absence to New Orleans, in April or May, 1828, six hundred and thirty-five dollars, as per his receipt?

Ans. I don't now recollect of Orman & Young paying R. Sewall, in 1828, two thousand dollars, but distinctly recollect of paying him myself about the amount stated in the question a few weeks afterwards, when Mr. Orman was absent to New Orleans, for which I believe I took his receipt. The books will show the precise amount.

26th. While Orman & Young and Rufus Sewall were en-

deavoring to effect the trade before alluded to, did Rufus Sewall have an opportunity of looking at the books and papers of Orman & Young, and did he or not examine and calculate for himself, and while Orman was gone to New Orleans in April or May, 1828, was not Rufus Sewall at Webbville for three or four weeks, and was he not frequently in the store examining the books, notes, &c., of Orman & Young, and did he not at this time consult you respecting the profits of the business previously done, and that might in future be done ?

Ans. During Mr. Sewall's stay at Webbville, in April, 1828, as well as at all other times when I was in the store, he had free access to the books and papers belonging to the concern. He was there a day or two in Mr. Orman's absence to New Orleans, but whether he examined or made any calculations I do not recollect. Mr. Sewall and myself frequently conversed upon the profits of the business previously done by Orman & Young, and the prospect of doing a profitable business by a separate concern, to be established at Webbville, which was then contemplated.

27th. What did Rufus Sewall say to you respecting the old business of Orman & Young, and what did he say to you respecting the then business of Orman & Young ?

Ans. I don't recollect of his saying any thing particularly more than what I have stated.

28th. During Orman's absence to New Orleans, in April, 1828, did or did not Rufus Sewall say to you that he must have some business going on in this section of the county, and with that intention make a proposition to you to join him and his brother Charles A. Sewall, in business, he furnishing all the capital ?

Ans. Rufus Sewall did make a proposition to me, in 1828, to join his brother, Charles A. Sewall, in business, he

furnishing all the capital and facilities for carrying on an extensive business.

29th. Do you know that when Orman & Young made out their memorandum for goods for fall and winter stocks, that that memorandum was forwarded to William Taggard & Co., New York, to be filled by them, and though Orman & Young knew that Rufus Sewall was or would be in New York, they did not address him on the subject?

Ans. Orman & Young did forward to William Taggard & Co., in the summer of 1828, an order for fall and winter goods, which *they declined supplying*, and this circumstance was attributed by Mr. Orman to some unfavorable representation made to them by Mr. Sewall, who was then supposed to be in New York. Orman & Young did not, to my knowledge, address Mr. Sewall on the subject of the order.

30th. Did Rufus Sewall write to you in July or August, 1828, requesting you to act as his agent, and who might, if necessary, act in conjunction with James Webb, Esq., in effecting a settlement with Orman & Young, and is not both his letters to you and your answer in return, now attached to your answers to the interrogatories now filed in the clerk's office of the Superior Court in this county, in the case of Orman & Young vs. Rufus Sewall and E. J. Bower, in Chancery; and is not also the estimate or *trial sheet* attached thereto, in the handwriting of Rufus Sewall?

Ans. He did. They are I suppose, and it is.

31st. Do you know that after Rufus Sewall returned to Webbville, in December, 1828, many attempts were made to effect a settlement of the business of Orman & Young and Rufus Sewall, between themselves, all without success, and after laboring two or three weeks, ended without doing any thing?

Ans. I do not know it but so understood it from Mr. Sewall.

32d. Do you or do you not know that after December, 1828, a proposition was made, and calculations and estimates were roughly made for a lumping and general sale by Orman & Young to Rufus Sewall, and during the whole of the time that the negotiation for said trade was going on, did or did not Rufus Sewall have free access to the books, notes, &c., of Orman & Young, and examine and calculate for himself, and did he consult you upon all subjects and at all times when he entertained doubt in any matter, and were you consulted with regard to the nature, situation, amount and solvency of the debtors to Orman & Young, including all the business done both before and after 7th March, 1828, and with regard to the value of property of every description?

Ans. I know but little that took place while the negotiation was pending, except what I learned from Rufus Sewall. He informed me of their progress from time to time, and consulted me on the business generally, and on particular points wherein he entertained doubts, and on which he was ignorant. I don't know whether Rufus Sewall had free access to the books, papers, &c., *during this time*, as I was seldom, if ever, in the store, but heard *no complaint* of Mr. Sewall of the contrary. I don't recollect that he consulted me as to the value of the property, but believe he did.

33d. Was there any inventory of the goods that Orman & Young had on hand taken, or were they put down at a lump, without measuring, weighing, &c., at the time they sold out to Rufus Sewall, and was it the same with cotton, corn, bacon, horses, mules, negroes, gin-house and lot, &c.? Was or was not the foregoing put down at their estimate value at the time the sale was made, and did Rufus Sewall consult you upon all these subjects?

Ans. No inventory of the stock on hand was taken at the time of the trade, as I ever knew or heard of from either

party, but have always understood from both parties that the goods were roughly estimated at, I believe, seven thousand dollars, including those at St. Andrew's Bay. All the other property was estimated in the same way, *with the exception* of the notes, accounts, &c., which I supposed to have been as correctly ascertained from the books and papers as they could be under the circumstances.

34th. Do you or do you not know, that from the situation of the books, then being behind in posting, &c., that it must have been almost impossible from their situation and the extent of business and amount of debts due to Orman & Young to have got any thing like accuracy in the amounts in the time this trade was in its negotiation to completion?

Ans. It would have been extremely difficult, if not impossible to arrive at anything like the correct amount due Orman & Young in the time the trade was negotiating.

35th. Did you or not hear Rufus Sewall say that he did not expect anything like accuracy in this lumping business, and that Orman & Young had proposed to throw in five thousand dollars to cover all bad and doubtful debts, and also all errors that might or could possibly arise in the hurry in which the estimates were made, as well also as to compensate for collections; and do you believe to the best of your knowledge, that the sum of five thousand dollars would cover all bad and doubtful debts, errors, &c., that have arisen from the business?

Ans. I don't distinctly recollect of hearing Rufus Sewall say anything on these points, but have always understood, and have not heard it contradicted by either party, that five thousand dollars were thrown in to cover bad debts, errors and small amounts due by the concern, which sum I thought amply sufficient for that purpose, and from all I know, I believe it will be sufficient.

7

36th. Did you understand that the trade was a general and lumping one, or of a specific nature? What was the nature of the trade?

Ans. I understood from both parties that the trade was a general and lumping one, and that the estimate was made out for the purpose of arriving as near to the value of whole concern as they could, without measuring, weighing or counting any thing.

37th. Did Orman & Young make and execute their bill of sale or transfer, to Rufus Sewall, of the notes, accounts, goods and property of any description owned and claimed by them, excepting the amount of seventeen thousand five hundred dollars, and the amounts of their individual accounts in the books, without claim, drawback or recourse on them in any way, and did you subscribe as a witness to the same, and when was said bill of sale or transfer made, executed and delivered?

Ans. They did. I was a witness to the same, as well as I recollect, on the 14th of January, 1828, when it was also delivered.

38th. Are the books and papers that Orman & Young had in their possession at the time the sale was made, and that were transferred over to and left in the possession of Rufus Sewall, that are material, now here before the auditors, and state what are absent?

Ans. I believe all the books belonging to the concern of Orman & Young were delivered up to R. S. Sewall at the time of their trade, some of which I have seen in the possession of the auditors, viz: the cotton-book, kept at St. Andrew's Bay, and the last note-book kept at Webbville.

39th. Do you know that there was the sum of thirty seven dollars or thereabouts, short of the amount that Orman & Young were to receive, on comparing the notes and accounts

they took with the list, they excepted in the bill of sale or transfer?

Ans. On the 14th January, when the papers were signed and exchanged, Mr. Orman observed to Mr. Sewall that the notes, accounts, &c., which he had received, fell short of the amount agreed upon, by about thirty-seven dollars, which Mr. Sewall said he would settle at any time.

40th. Do you know that in H. Haley's account, taken by Orman & Young, they took the whole amount of the debt, without deducting from it the credit that stood fair upon the ledger?

Ans. I do; and the credit was thirty dollars as well as I recollect.

41st. Do you know that Orman & Young credited John Brett, sr., on his note that they had taken for cotton that was delivered after the sale of the gin-house, and how much, and that the credit was then made because it had been the previous understanding with said Brett, that what cotton he delivered was to be applied on his notes?

Ans. I have but a faint recollection of this circumstance, and believe I merely heard of it.

42d. Do you know that Rufus Sewall purchased from James Webb, land, negroes, hogs and other property of large amount, and paid for the same out of notes, accounts and means that he received from Orman & Young? If so, please state the amount and describe the land, negroes and other property so purchased by said Sewall.

Ans. I was informed by Rufus Sewall that he had purchased from James Webb a quantity of property which I cannot particularly describe, consisting of about three-quarter sections of land, eleven negroes, cattle, hogs, horses, mules, wagons, farmers' utensils, bacon, &c., to the amount of six thousand five hundred dollars, for which he paid him mostly in the proceeds of the concern of Orman & Young.

43d. Did Rufus Sewall take titles to lands, negroes and other property purchased of James Webb in his own name, or in the name of Rufus Sewall, John O. Sewall, and C. A. Sewall, and when was this trade made and titles executed?

Ans. I have seen in the possession of Charles A. Sewall, a deed of land, or bill of sale, (I did not particularly examine it,) made by James Webb to Rufus Sewall, John O. Sewall and Charles A. Sewall, jointly, (to the best of my recollection.) I do not know when the sale was made or titles executed, but believe it was in February or March, 1830.

44th. Did Rufus Sewall purchase from Wm. J. Watson and James F. Russ, land and other property of large amount, and pay for the same out of the notes, accounts and means he had received from Orman & Young? If so, please state the amount and describe the land and other property, if any, and when was this trade made and titles executed.

Ans. Rufus Sewall did purchase from William J. Watson about three quarter sections of land, I think in January or February, 1829, for which he paid about three thousand dollars in the means of the concern of Orman & Young. The titles were executed sometime after the trade was made. I also purchased, as agent for Mr. Sewall, about forty acres of land of James F. Russ, on which were buildings, &c., for which I paid him about two hundred and sixty dollars in the proceeds of the concern of Orman & Young, with the exception of thirty or forty dollars which I paid him in goods from the store of Bower and Sewall.

45th. Do you know of any other lands, negroes, houses and lots, or any other property that was purchased with goods, notes, accounts and means that Orman & Young transferred to Rufus Sewall? If so, please state all you know.

Ans. About the same time that Rufus Sewall purchased the land of Dr. Watson, he bought from Thomas J. Scur-

lock a quarter section of land, for which I paid him seven or eight hundred dollars, (I don't recollect the exact amount,) in the proceeds of the concern of Orman & Young.

46th. What was the actual value of the goods, to the best of your knowledge and belief, at the time of the sale by Orman & Young to Rufus Sewall?

Ans. From my *present* knowledge of the goods at Webbville and St. Andrew's Bay, (for I know nothing of those at the Bay when the trade was made,) I should judge them to be worth in cash, about six thousand dollars.

47th. Did or did not Bower & Sewall consider that they had got a great bargain in the goods at the price that Rufus Sewall sold them to them, and did or did not Rufus Sewall write to Bower & Sewall, stating that there were several bales of goods at St. Andrew's Bay, and sundry other articles that were not included in the inventory that Bower & Sewall had made at that place?

Ans. Bower & Sewall received the goods at Webbville at thirty-five hundred dollars and those at St. Andrew's Bay at three thousand dollars, conditionally, that they should, on taking an inventory, amount to nearly that sum, more or less. Bower & Sewall did not consider them a bargain on the terms they received them—say on a credit of two years, without interest, for it was partly in consideration of this circumstance that Rufus Sewall was to receive three-eighths of the profits of the concern. After taking an inventory of goods at St. Andrew's Bay, which amounted to about twenty-eight hundred dollars, Rufus Sewall, upon examination, discovered articles to a considerable amount not included in the inventory, among which was a bale of domestics.

48th. Did you or not understand that the sale by Orman & Young to Rufus Sewall, was not completed until the date of the bill of sale and the bond, which was on the 14th Janu-

ary, 1829, and that whatever estimates were made previous to this, was not relied on at all?

Ans. I always understood and believed that the trade was not consummated until the 14th day of January, 1829, when the bill of sale and bond were signed. I do not know whether the estimates previously made were relied on or not.

49th. Did you or not understand at the time of the sale by Orman & Young to Rufus Sewall, and at the time the bond was made and executed by Rufus Sewall and Ebenezer J. Bower to Orman & Young, that the amount of cash that Orman & Young had agreed to pay to George C. Hodges and Arthur Foster, on account of the cotton purchased of them, and all sums due from Orman & Young, was provided for generally in the bond?

Ans. I understood that the bond was to indemnify Orman & Young against the payment of the debts generally. No debt was especially considered that I recollect.

50th. Is the goods containing the inventory of goods and stock, taken on the 7th March, 1829, now before the auditors?

Ans. I have not seen it.

51st. Is there any book before the auditors containing the original entries by Orman & Young or by their clerk, of the business done from the 1st to the 14th January, 1829?

Ans. I do not know.

The further testimony of E. J. Bower in answer to interrogatories propounded to him before the auditors:

Interrogatory 1st. What was the situation of Orman & Young when you first became acquainted with them?

Ans. I understood that they were both clerks for Rufus Sewall or William Hitchings & Co.

2d. Were you clerk for Orman & Young about two years preceding the first January, 1829?

Ans. I was.

3d. Were not the books of William Hitchings & Co. in the store of Orman & Young during that time, and was it not your impression that the accounts on said books were generally settled?

Ans. They were, and it was.

4th. Was not the business after the 7th March, 1828, transacted on the same capital as before?

Ans. It was.

5th. Did you not understand from Thomas Orman that he had, about the first January, 1829, disposed of all his interest in the concern of Orman & Young, and state all you know about it?

Ans. I did so understand from Mr. Orman. About the first of January, 1829, I observed to Mr. Orman that I understood from Mr. Sewall, that he, (Sewall,) had contracted for the purchase of his, (Orman's) interest in the concern, and without making any reply, Mr. Orman asked me how I had understood it. I told him I understood that he was to receive six thousand five hundred dollars, and the store and warehouse at St. Andrew's Bay, which he merely signified to me was correct. This I understood was before any estimates were made of any of the property.

6th. Did you know the reason why Thomas Orman would not comply with the aforesaid trade?

Ans. I do not know, but from Mr. Orman's being so extremely cautious not to commit himself, I supposed the trade was not considered so far consummated by him as to preclude his dissent if he chose, and from his informing me afterwards, when he had made out a list of notes, that the amount far exceeded his expectations, I was led to believe that that was the cause of his not complying with the aforesaid trade.

7th. After this time, was not Rufus Sewall extremely

anxious to get the amount due him and his interest in the concern in his own hands?

Ans. He was.

8th. At the time of the trade in which Orman & Young were allowed seventeen thousand five hundred dollars, did you not believe the amounts of accounts were taken from the books as balances due, as near as could be ascertained under the circumstances?

Ans. I did.

9th. What do you consider the property given up to Orman & Young worth, in proportion to that retained by R. Sewall?

Ans. I considered a great part of it, say *ten thousand,* worth twenty-five per cent. more, in proportion, than that retained by Mr. Sewall, take it altogether.

10th. What did you consider Orman & Young's stock of goods worth at the time of their trade, and were they not received in the concern of Bower & Sewall at six thousand five hundred dollars, and on what credit would you consider them a fair trade at that amount?

Ans. I considered Orman & Young's stock of goods, at the time of trade, worth in cash six thousand dollars. They were received by Bower & Sewall at sixty-five hundred dollars, which I considered a fair price, at one year's credit.

The further testimony of E. J. Bower in answer to interrogatories before the auditors:

Int. 1st. Were you in possession of the books, accounts, notes, &c., that Rufus Sewall purchased from Orman & Young, and were you entrusted with the closing and settling up of the books and accounts and receiving payments of the notes, and generally attending to Rufus Sewall's business, from the time of the purchase from Orman & Young, until after the 2d day of July, 1829?

Ans. I was until about the time named in the question.

2d. Did Rufus Sewall purchase cotton, either in the seed or ginned and packed in the bale, after the 14th January, 1829, up to the 2d July, 1829?

Ans. Not that I recollect of.

3d. Do you believe you would have known of any and all such purchases of cotton, had they been made by Rufus Sewall?

Ans. I do.

4th. Did Rufus Sewall make you his agent generally to transact for him, and to attend to his business during his absence?

Ans. He did.

5th. Did Rufus Sewall leave the Territory of Florida, or did he leave Jackson and Washington counties soon after purchasing Orman & Young's interest in the concern?

Ans. He did.

6th. Did you, as agent for Rufus Sewall, purchase any cotton in any way? If so, please state how much.

Ans. I did not.

7th. Did Bower & Sewall purchase any cotton, either on their own account, or for, or as the agents of Rufus Sewall, either in the seed or in the bale, up to the 2d July, 1829? If so, please state how much.

Ans. They did not.

8th. Was or was not all the cotton that was shipped from St. Andrew's Bay in the month of February, 1829, to the best of your knowledge and belief, the same that was purchased and received from Orman & Young?

Ans. It was.

9th. Was or was not this cotton shipped to Mobile?

Ans. I do not know, but believe it was.

10th. Did you take with you to New Orleans in July, 1829, a cargo of upwards of sixty bales of cotton from St.

8

Andrew's Bay? If so, state the number of bales and the name of the vessel it was shipped in.

Ans. In July, 1829, I took to New Orleans a cargo of cotton, consisting, I believe, of sixty-four bales, from St. Andrew's Bay, on the schooner Magnolia, of Mobile.

11th. Was or was not the greater part, or nearly all this cargo of cotton that you took to New Orleans, the cotton that Rufus Sewall purchased from Orman & Young on the 14th January, 1829 ?

Ans. Between thirty and forty bales, as well as I recollect, were of the cotton purchased by R. Sewall of Orman & Young.

12th. What was the average weight of a bale of the cotton you took to New Orleans?

Ans. I do not recollect.

13th. What was the value of cotton per pound when delivered at St. Andrew's Bay, on or about the 14th January, 1829, and what did the cotton cost Orman & Young delivered at St. Andrew's Bay ?

Ans. From seven to eight cents.

14th. What was Orman & Young paying for the last cotton they bought in Jackson county, previous to the 14th January, 1829?

Ans. From seven to eight cents.

15th. Did Orman & Young purchase from George C. Hodges and Arthur Foster their crops of cotton?

Ans. They did.

16th. Was it customary or not for Orman & Young to charge interest on accounts after the 1st January, the time they fell due?

Ans. It was.

17th. Was it usual for their customers to pay interest on their accounts when charged?

Ans. It was, with some exceptions.

The further testimony of E. J. Bower, in answer to interrogatories propounded to him before the auditors:

Int. 1st. Do you know of any agreement between Thomas Russ and Andrew Young, relative to cotton? If so, please state all you know of such agreement, when and where it took place.

Ans. I do know of an agreement between Thomas Russ and Andrew Young, which, as well as I recollect, was as follows: I think it was in September, 1827, that Mr. Russ stated to Mr. Young that he was anxious to pay off a certain note given to Orman & Young, and signed by Joseph Russ and Sion Smith, for four hundred dollars, with interest at the rate of fifty per cent. per annum, and that he had cotton of the preceding and the (then) present year's crop, ready to deliver for that purpose, and represented it to be fair and dry; that he could have ginned it immediately at Mooring and Joseph Russ's gin, or both, which would enable him to pay the note and stop interest at once. Mr. Young, being anxious to have the ginning of the cotton, prevailed upon him to wait two weeks, when he expected Orman & Young's gin-house would be ready to receive it, which Mr. Russ agreed to, upon condition, that if the gin-house was not ready in two weeks, then, after allowing a reasonable time for hauling, ginning and packing the cotton, the interest on the note should cease, which Mr. Young agreed to. The gin-house was not ready at the time agreed upon and the cotton was not delivered till some time after it was ready, and after Mr. Orman's return from the North, which I believe was in November.

2d. Did Thomas Russ say to Andrew Young at the time of making said agreement, that he had his cotton all ready to deliver at different gins? and you will please state Andrew Young's reply to said statement of Russ.

Stephens vs. Orman.—Opinion of Court.

Ans. This question is fully answered in the statement above.

3d. Did Thomas Russ comply with the terms of said agreement by delivering cotton as soon as the gin of Orman & Young was ready?

Ans. This question is also answered in the statement above.

4th. Did Thomas Russ misstate the agreement between him and said Young to Orman, about the time he said he was ready to commence delivering said cotton, and did not a difficulty arise at this time between Orman and said Russ, and how was that difficulty terminated?

Ans. Mr. Russ misstated the agreement, according to my understanding of it, by stating that the interest on the note was to cease after the expiration of the aforesaid two weeks, when the gin-house was to have been ready. He then went to St. Andrew's Bay to see Mr. Young on the subject before, I think, he commenced hauling the cotton.

5th. When Thomas Russ commenced delivering cotton, was he not told by Orman the cotton that he was hauling was not merchantable, and would not be received in any other way than to gin for him, and was not said Russ content with that arrangement at the time?

Ans. He was, but whether he was content or not, I cannot say, he, notwithstanding, continued to deliver it.

6th. In an attempt to settle with Thomas Russ, after the delivery of all the cotton he had, was there not a receipt drawn for the cotton, and also a note drawn for the amount of Thomas Russ's account for the previous year's trade, which Orman was trying to have settled, but Russ refused to sign said note and close the account, upon which Orman also refused to sign said receipt, though said Russ requested him to do so, after hearing the receipt read to him, and after reading it himself?

Ans. I don't recollect that the note and receipt were read to him or by him. To the balance of these questions I answer yes.

7th. Did not Orman then take both the receipt and note, (wanting each a signature to complete them,) and attach them by wafer to that page in the ledger in which Thomas Russ's account last stood, and are they not both there now, as previously affixed by Orman ?

Ans. He did, and they are.

8th. Do you believe from the best of your knowledge that in settling the whole business with Thomas Russ, as was afterwards done by Rufus Sewall, that it was closed greatly to the disadvantage of Orman & Young, and contrary to your view of the agreement, first and secondly spoken of, and to the papers themselves ?

Ans. I thought at the time the settlement was made with Mr. Russ, and still think it was settled considerably to the disadvantage of Mr. Sewall, in settling the concern of Orman & Young, inasmuch as he conceded what I considered him justly entitled to, and what he might have received by law.

9th. Was not you, Mr. Bower, in company with Peter W. Gautier, jr., chosen by Rufus Sewall and Thomas Russ to arbitrate and settle all matters between said Russ and the firm of Orman & Young, and did not Rufus Sewall take the business out of your hands, so far as this, by agreeing to do himself, with said Russ, what you thought not right and just, and contrary to his previous instructions to you in arbitrating ?

Ans. To these questions I answer yes.

10th. Do you know of Joseph Russ and Sion Smith, or either of them, ever paying Orman & Young anything on a certain note held by them for four hundred dollars, bearing fifty per cent, interest per annum, dated in December, 1826?

Ans.  I do not.

11th. If you know anything further that will make for the advantage of Orman & Young, please state it.

Ans.  I think of nothing more than I have stated in the foregoing answers that will tend to the advantage of Orman & Young.

Testimony of William J. Watson in answer to interrogatories propounded to him before the auditors :

Interrogatory 1st. Were you Judge of the County Court in 1829 ?

Ans.  I was.

2d. Did Rufus Sewall consult with you on the subject of settlement with Orman & Young ?  Did he not state that he had great difficulty in adjusting his business with them ? Please state what you know of it.

Ans.  He did once or twice state to me he found it very difficult to effect a settlement with Orman & Young upon anything like fair terms.

3d. Rufus Sewall applied to me, I think, in the latter part of December, '28, or fore part of January, '29, for a bill of injunction, for the purpose of arresting his property from the hands of Orman & Young as he informed me, that he might be enabled to effect a fair settlement of the concern ; that a settlement had been offered him by Orman & Young, but upon such terms as he could not think of acceding to.  Not being myself acquainted with the nature of a bill of the kind, I told Mr. Sewall I doubted my authority to grant it.  I advised him to effect a settlement peaceably if he could.  On a second interview, in Webbville, perhaps the day after the first conversation, while on my way to Tallahassee, Mr. Sewall again applied to me for a bill of injunction, that, upon my refusal, he believed he should be materially injured.  I told him I was still doubtful of my power to grant a bill to stop a proceeding in which so large

an amount was involved, but that, on my return from Talla-hassee, would make up my mind finally on the subject, still advising him to persevere in effecting a peaceable adjust-ment of the matter, if possible ; that, in the event of my granting a bill, which was doubtful, the cost must be con-siderable to one party or the other. On my return from Tallahassee, Mr. Sewall informed me he had settled the mat-ter on terms offered by Orman & Young, with which he ap-peared much dissatisfied.

The further testimony of W. J. Watson in answer to in-terrogatories propounded to him before the auditors :

Interrogatory 1st. Did or did not Rufus Sewall, on ap-plication to you for an injunction, enjoin on you the most strict secrecy ?

Ans. He did request me to say nothing about his appli-cation for the bill until it was determined what would be done.

2d. Did you propose to have some time and place appointed that the parties (Orman & Young and Rufus Sewall) might meet, and be heard by themselves or attorneys, and what did Rufus Sewall say to this proposition ?

Ans. I cannot recollect that I did.

3d. Did Rufus Sewall say that he wanted to and must pounce upon Orman & Young in the way he was endeav-oring to do, that is, by injunction, and get the means and business in his own hands, and then he could bring Orman & Young to his own terms ? If so, please state it and what conversation passed while on this subject.

Ans. Rufus Sewall stated to me he wanted the bill of injunction granted that he might get the effects of the con-cern into his hands, or the hands of other persons appointed for the purpose, to prevent Orman & Young from taking off any papers or other property belonging to the firm, hence it appeared he wished the matter kept secret, that

Orman & Young, from a knowledge of what was to be done, might not secure to themselves any part of the funds; he further stated, if the property could be got from them in that way, he had no doubt but a settlement could be effected with them.

4th. Did you of your own knowledge know, or have you ever heard it alleged, except by Sewall, that Orman & Young were secreting or disposing of any of their effects, cash, goods, cotton, or property of any description whatever, for the purpose of defrauding their creditors, or any one?

Ans.  I did not.

5th.  Did Rufus Sewall purchase from you a tract of land? If so, state with what funds you were paid, and describe the land.

Ans.  Rufus Sewall purchased from me the north-west quarter of section five, township five; the north-west quarter of section eight; the east half of the north-east quarter, and the east half of the south-east quarter of section six; all of township five, range eleven, north and west, for which he paid me five or six hundred dollars in cash, and the balance, (say twenty-three hundred dollars,) in notes due or given to Orman & Young.

The testimony of Wm. W. Loftin, in answer to interrogatories propounded before the auditors:

Interrogatory 1st.  Were you present in Webbville at the time, say about the 1st January, 1829, and did you understand by various persons that Orman had sold out his interest in the concern of Orman & Young for $6,500, and did you not go in company with R. Sewall to St. Andrew's Bay, and did you not understand, on Sewall's arrival at St. Andrew's Bay, that Young refused to show him the books of the concern?  Please state what you know.

Ans.  I was at Chipola, in Webbville, about the 1st Jan-

nary, 1829, and did understand by some person there that Orman had sold out his interest in the concern of Orman & Young to Rufus Sewall for $6,500 or thereabouts, and did go in company with R. Sewall, but he preceded me a few hours from the Econfena, and on my arrival at the store of Orman & Young, at the head of St. Andrew's Bay, Sewall informed me that Young had refused giving him access to the books, and that said Sewall expressed fear and alarm that Orman & Young intended taking advantage of him by retaining his property from him.

The further testimony of Wm. W. Loftin, in answer to interrogatories propounded to him before the auditors:

Interrogatory 1st. Were you owing Orman & Young by note dated in September, 1828, the sum of sixty-three dollars and forty-one cents?

Ans. There was a note of about the sum of sixty-three dollars, which I paid Sewall.

2d. Were you owing Orman & Young, by open account on their books at St. Andrew's Bay, on the 1st and 14th January, 1829, and how much?

Ans. I was owing Orman & Young a small amount which the books will show.

3d. Is the statement hereto attached, in your hand-writing and signature, official, correct to the best of your knowledge?

Ans. The statement hereto attached concerning the shipment of cotton is correct, to the best of my knowledge and belief, viz:

The schooner Carrol, of New York, arrived in St. Andrew's Bay in ballast, from Pensacola, and sailed on February 11th, 1829, for Mobile, with a cargo of one hundred and twenty-two bales of cotton, shipped from the head of St. Andrew's Bay; and on July 2d, 1829, the schooner Magnolia, Lewis Lecland, master, sailed from the same place

9

above mentioned with a cargo of sixty-eight bales of cotton, bound for New Orleans.

The further testimony of Addison Mandell, in answer to interrogatories propounded to him before the auditors :

Interrogatory 1st. Please state whether you had for collection a debt against Orman & Young, in favor of J. L. Florence, and if you applied to Rufus Sewall for payment, and what was his answer, and state the time.

(See answer in former deposition above.)

Cross interrogatories by Rufus Sewall :

1st. What was the conversation which took place between you and Sewall in relation to the above matter ?

Ans. At the time of the conversation, Mr. Sewall stated to me that he had given an obligation to Orman & Young to settle this and other debts, but Sewall expressed an anxiety that the debts should be collected of Orman & Young as soon as possible, in order to close the concern.

Testimony of Sears Bryan in answer to interrogatories propounded to him before the auditors :

Interrogatory 1st. Was you present when a conversation arose between Orman & Young and Rufus Sewall, for selling of their (Orman & Young's) interest in the concern ?

Ans. I was present at one conversation.

2d. Where was it that this conversation took place ?

Ans. Opposite the old store of Orman & Young in Webbville.

3d. How much, and in what did Rufus Sewall offer to Orman & Young, and how much, and in what did Orman & Young say they would take for their interest ?

Ans. Seventeen thousand five hundred dollars was the offer of Rufus Sewall, and my convictions were at that time that the bargain was closed up to that instant.

4th. Did Rufus Sewall advance on his first offer, and how much ?

Ans. I do not recollect.

5th. Did Orman & Young refuse to take less than they at first said they would?

Ans. I believe they did.

6th. Did the parties separate, not agreeing on a trade at this time?

Ans. I do not recollect.

7th. Did you hear either of the parties during this conversation say anything about estimates or value of property in any way?

Ans. I do not distinctly recollect.

8th. Did you or not understand at the time, that it was for a lumping trade altogether, and considered so by the parties themselves?

Ans. That was my impression.

9th. Did Rufus Sewall pursue Orman & Young towards their gin-house after this conversation took place?

Ans. I do not recollect.

10th. Did you not understand from the parties that they had effected a trade on the same day that this conversation you speak of took place, for the sum of seventeen thousand five hundred dollars?

Ans. I understood such to be the trade, but do not remember whether it was the same day, or what day it was; it was within a few days thereafter.

11th. Do you believe from all you heard between the parties and from what transpired within your knowledge, that the sale was made by Orman & Young to Rufus Sewall, of their interest in the concern for seventeen thousand five hundred dollars, on or about the same day that you heard the parties, (Orman & Young and Rufus Sewall,) bargaining or endeavoring to effect a trade?

Ans. Answered in third and tenth answers.

Interrogatory by Rufus Sewall:

1st. Did you ever hear Sewall express a wish or anxiety to close the concern previous to the sale?

Ans. I did.

Ques. 2. What conversation took place at this time between you and Rufus Sewall?

[Remark.—The record does not give the answer to this question, if any was made.]

Testimony of George C. Hodges, in answer to interrogatories propounded before the auditors:

Interrogatory 1st. Did Orman & Young purchase from you your crop of cotton in the year 1828?

Ans. Yes.

2d. When was it they made the purchase?

Ans. Some time in December.

3d. Was the cotton to be delivered at Col. A. Foster's gin or at St. Andrew's Bay?

Ans. At Col. Foster's gin.

4th. What was the price Orman & Young was to pay for your cotton?

Ans. I cannot say positively, but I think about 7⅜c.

5th. Did Orman & Young, at the time they purchased your cotton, agree to let you have, by a certain time, about four hundred dollars to pay for land?

Ans. They did.

6th. Did you or not consider Orman & Young bound to you for the payment of this cotton?

Ans. I considered Mr. Orman bound.

7th. Did you call on Orman & Young for the cash they had agreed to pay you?

Ans. I called on Orman once; he stated the money should be paid, and finally went with me to Mr. Bower with whom I settled, and I considered Mr. Bower as the clerk of Rufus Sewall.

8th. Did Orman & Young tell you that there was an ar-

rangement made with Rufus Sewall to pay the money Orman & Young had agreed to pay you?

Ans. I do not recollect.

9th. Was the money paid by him or by E. J. Bower for him? Was it or not so arranged as to answer your purposes?

Ans. I received the money from Mr. Bower, and the settlement was effected to my satisfaction.

.10th. How much cotton did you deliver on the agreement made with Orman & Young?

Ans. I do not recollect.

11th. Do you know any thing of an agreement (verbal) made with Col. A. Foster for his crop of cotton? If so, please state what were the conditions of that agreement, and how much cotton Col. A. Foster delivered, and the price he was to receive for it.

Ans. Orman & Young agreed to pay Col. Foster $400 on account of his cotton crop, which amount was actually paid by Mr. Bower for Rufus Sewall by exchange of notes.

12th. Did you or not understand from Col. A. Foster that he considered Orman & Young bound to him for the payment of this cotton?

Ans. I did.

13th. Were you in company with Col. A. Foster when he called on Orman & Young for the amount they agreed to let him have to pay for land, on account of the cotton he had sold them?

Ans. I was.

14th. Did Orman & Young, on application to them by you and Col. A. Foster, go with you both to the store of Bower and Sewall, and talk with E. J. Bower, about arranging the business with you and Col. A. Foster, for the payment of the amount of cash Orman & Young had agreed to pay you both on account of the cotton they had purchased of you and Col. A. Foster?

Ans.   Mr. Orman did go with us, but the conversation I do not recollect.

15th. Was the payment made satisfactory to you and Col. A. Foster, as per agreement with Orman & Young by E. J. Bower, as the acting agent of Rufus Sewall?

Ans.   It was.

Testimony of Nathan Spears in answer to interrogatories propounded to him before the auditors:

Interrogatory 1st. Were you employed by Orman & Young to attend to their business at their gin-house and lot, in the year 1828?

Ans.   I was.

2d. When did you commence attending to their business?

Ans.   I commenced attending to business for Orman & Young about 2d or 3d of October, 1828.

3d. How long were you in their employ?

Ans.   Two months and ten days.

4th. Had Orman & Young a quantity of cotton in the seed to gin out when you commenced attending to their business? If so, please state how much.

Ans.   They had about 40,000 lbs. to gin.

5th. How long were you engaged in ginning the said cotton they had on hand?

Ans.   About six weeks ginning and packing.

6th. Do you not believe, from the best of your knowledge, that the seed cotton that Orman & Young had on hand and was ginned out by you, was of the crop of the previous year, 1827?

Ans.   I believe it was.

7th. Was it or not packed very close in the seed, and covered over with dust as if it had laid some time on hand?

Ans.   It was.

8th. As fast as this cotton was ginned and packed, was it or not taken by teams to haul to St. Andrew's Bay?

Ans. It was, except what was burnt.

Interrogatories by Rufus Sewall:

1st. How much cotton was burnt?

Ans. There was from seven to nine bales burnt.

2d. Was any cotton burnt previous to your arrival at the gin?

Ans. No.

Testimony of Warren Nalls, before the auditors:

Interrogatory 1st. Were you employed by Orman & Young to attend to their business at their gin-house and lot in the year 1828?

Ans. I was a carpenter; not engaged in that capacity; sometimes received cotton.

2d. When did you commence attending to their business?

Ans. Some time in September.

3d. How long were you in their employ?

Ans. About four months.

4th. Had Orman & Young a quantity of cotton in the seed to gin out when you commenced attending to their business? If so, please state how much.

5th. How long were you engaged ginning the seed cotton then on hand?

Ans. I never ginned any.

6th. Was not the cotton received from the first of your engagement with Orman & Young, or to the time that Nathan Spears commenced superintending their business?

Ans. I do not recollect.

7th. What quantity of cotton was burnt?

I recollect to have heard Mr. Orman say he thought there was about twelve bales burned.

Interrogatory by Mr. Orman:

Do you or not believe that Nathan Spears had a better opportunity of knowing the quantity of cotton burned than Orman?

Ans. Yes, better than any other man.

The testimony of Peter Gautier, jr., before the auditors:

Interrogatory 1st. Do you know that there was a judgment in favor of Rufus Sewall against John Register, obtained in Henry county, Alabama, in the year 1828?

Ans. I do.

2d. What was the amount of the judgment?

Ans. I think about five hundred and twenty-five dollars.

3d. Do you or not know that Orman & Young were the owners of the debt against John Register, sued on in the name of Rufus Sewall?

Ans. Mr. Orman had control of the suit, but whether in his own right or agent for Sewall, I never knew.

4th. Have you not understood from Rufus Sewall that the judgment obtained against John Register was assigned to and was the property of Orman & Young?

Ans. I never did, until in a conversation before the auditors.

5th. Was the judgment standing against John Register at the time Orman & Young sold out their interest in their concern to Rufus Sewall, on the 14th January, 1829?

Ans. The judgment against Register was standing open against him at the time of the transfer to Rufus Sewall by Orman & Young.

6th. At the time the trade between Orman & Young and Rufus Sewall was in negotiation, did or did not Rufus Sewall consult you as to the situation of the judgment, and what advice did you give him?

Ans. I do not recollect that he did. Mr. Sewall consulted me in relation to the judgment, but whether before or after the transfer to him I do not know. I had previously advised Orman & Young to issue execution for the whole judgment, and the same advice I afterwards gave to Mr. Sewall.

7th. Had you or not given the same advice to Orman & Young on their informing you of the situation of the judgment?

Ans. Is answered above.

Cross Interrogatory. Please state all you know with reference to the suit against Register, and the proceedings had thereon.

Ans. In the fall of 1828, a judgment was obtained by Rufus Sewall in the Circuit Court of Henry county, Alabama, against John Register, on a note of hand. Several lots of cotton were delivered to Orman & Young in payment of said note, and by verdict of the jury, the cotton was to be received at a certain stated price. By a mistake of counsel the judgment was entered up for five hundred and twenty-five dollars, when the amount actually due did not exceed two hundred and forty-three dollars. Register obtained an injunction on the execution issued on said judgment on paying over the said sum of two hundred and forty-three dollars. Orman & Young were acquainted with the circumstance of the mistake in the entry of judgment, before the transfer to Sewall.

Notes, &c.

$2,500.00.

On the first day of February one thousand eight hundred and twenty-eight, for value received, we promise to pay Rufus Sewall or order, two thousand five hundred dollars with interest, after the 7th day of March next, at six per cent. per annum. If not paid within thirty days from the said first day of February, to have interest at the rate of fifteen per cent. per annum, until paid.

Test,        ORMAN & YOUNG.
S. BRYAN, Clerk.
Chipola, March 25th, 1826.

$1,500.

On the first day of May one thousand eight hundred and twenty-eight, for value received, we promise to pay Rufus Sewall or order, one thousand five hundred dollars, with interest after the seventh day of march next at six per cent. per annum.    If not paid within thirty days from the said first of May, to bear interest at the rate of fifteen per cent. per annum until paid.                    ORMAN & YOUNG.

Chipola, March 25th, 1826.

MOBILE, May 1st, 1827.

Eight months after date, we promise to pay Rufus Sewall or order, twenty-seven hundred dollars, negotiable and payable at the Bank of Mobile, for value received.

ORMAN & YOUNG.

MOBILE, January 6th, 1827.

One year after date, we promise to pay Rufus Sewall or order, three thousand one hundred and eighty-six dollars and seventy-five cents, negotiable and payable at the Bank of the St. Stephen's Steamboat Company, for value received.
$3,186.75.                    ORMAN & YOUNG.

MOBILE, May 1st, 1827.

Eight months after date, we promise to pay Rufus Sewall or order, twenty-five hundred dollars, negotiable and payable at the Bank of Mobile, for value received.
$2,500.                    ORMAN & YOUNG.

Endorsed, RUFUS SEWALL.

TOMBIGBEE BANK, ST. STEPHENS, ALA., }
8th August, 1827.   }

The notes, of which the above are copies, having been transferred to this bank, you are herby notified not to pay the same without receiving the notes with my endorsement thereon.    When due they will be deposited for collection in the Bank of Mobile, with the exception of the note payable

at the Bank of the St. Stephen's Steamboat Company, which will be deposited in that Bank.

Your obedient servant,

JOHN T. HAZUEL, Cashier.

To Messrs. ORMAN & YOUNG, Florida.

MOBILE, 2d, 1828.

MESSRS. ORMAN & YOUNG—*Dear Sirs:* I am without any thing from you for a long time, and your payments cause an immense deal of trouble. B. & S.'s account for $500 was due the 28th of August; Gay's bill for $652.97 was due yesterday, and paid. The packet Elizur, I presume, is departed before this. I hope to God the bills of lading are forwarded. Our time of co-partnership expires 7th March. I wish you would take account of stock and forward it by mail as I shall be unable to leave Mobile till in April, and give me your ideas as to the business; close it as fast as in your power. I am in immense advances to you and cannot sustain it. Indeed, I would not be so harrassed in mind for all the profits that will ever be realized from the concern.

Yours, &c., RUFUS SEWALL.

I obtained judgment against Stone for $17,527.26, and as the Court sits the last of March, it is necessary for me to be here. After I get my money from him and his securities, I shall be rich again, and until then I shall want all your aid.

AUDITORS' REPORT.

The undersigned, appointed by the Superior Court of Jackson county, to audit the books and accounts of Orman & Young, with a view to the settlement of differences existing in the accounts of Rufus Sewall, Thomas Orman & Andrew Young, formerly trading under the firm of Orman & Young, having gone into a minute and full examination of said books and accounts, beg leave to report the following as correct showing from the book :

### Dr. The old Firm.

| | |
|---|---:|
| To amount due Rufus Sewall on the 1st of January, 1829, | $22,021.76 |
| Debts in New Orleans, | 3,157.65 |
|    do  in New York, | 427.12 |
| Bad Debts, | 5,000.00 |
|     Balance, | 25,882.51 |
| | $56,489.04 |

| Orman & Young, | Cr. |
|---|---:|
| By Notes, | $27,396.75 |
| By amount of Accounts, | 15,697.14 |
| Cotton, | 3,255.30 |
| Corn and Pork, | 911.71 |
| Negroes, Horses, Gin-House, &c., | 2,430.00 |
| Goods on hand, | 6,500.00 |
| Thomas Orman's private account, | 233.68 |
| Andrew Young's  do     do., | 44.46 |
| | $56,489.04 |

The foregoing account is made from the books up to the first of January, 1829. The auditors thought proper to carry their examination up to that date only, inasmuch as the notes of the concern were all taken, leaving interest to that date, and besides the list of notes made out by Orman and handed over to the auditors, was dated 1st January, 1829. The amount of merchandize sold from the 1st to the 4th of January, was $374 70-100. The auditors did not include this amount in the accounts, for the reason given above, and because moreover, if the sales of merchandize up to the 14th of January be included, then the interest upon all the notes should be calculated up to that date, when in fact, it was cast only up to the 1st January. A note for $192, given for the hire of two negro boys, should, in the opinion of the auditors, be credited to Sewall, for the following reasons: The negroes were purchased by Orman &

Young some time in the month of December, 1828, and turned over to Sewall in about a month afterwards. The notes for their services being charged to him, besides as it appeared by evidence, the negroes were purchased with the funds and for the benefit of one Bryan, who afterwards sued Sewall for said negroes. A note for $200 drawn by Wm. T. Kilbee, is also left for the decision of the Court, and the Court is referred to papers marked B.

Another subject upon which the auditors were not satisfied sufficiently well to decide, is the cargo of schooner Carroll, which schooner was wrecked, and that part of her cargo which was saved sold by the Port Warden of Pensacola; this was some time after the 7th March, 1828, and it was contended by Orman before the auditors, that at that time Sewall was not a partner in the concern of Orman & Young, the partnership having expired, agreeable to the articles of co-partnership, on the 7th March, 1828. No evidence was adduced, however, to prove that any direct communications had passed between the parties as to the cessation of co-partnership at that time, and Sewall considered himself still interested up to the 1st January, 1829, which was the time of transfer. The Court is referred to papers marked A, which relate to schooner Carroll.

According to the agreement, Sewall is entitled to 2 per cent. per month on all advances of cash made by him up to the 1st January, 1829, with interest on the same. Also, he should be allowed a commission of $2\frac{1}{2}$ per cent. on all acceptances over and above $4,000, to which extent only he had bound himself to become responsible. The interrogatories in relation to the final settlement of the business have all been taken and are sent up to the Court for its consideration. Sewall is also entitled to 10 per cent. commissions for his services in closing the business, that is 10 per cent. on the whole amount of property estimated on page first of

our report. The Court will perceive by the articles of agreement that Thomas Orman and Andrew Young bound themselves to close the concern and settle up the business, instead of doing which it was thrown over upon Sewall, the senior partner of the concern, and the individual who advanced originally all the capital. Upwards of two years of his time has already been consumed and the business not yet been concluded.

The last subject to be named to the Court is the account of Thomas M. Bush. The circumstances are as follows: A lot of goods purchased in New Orleans by Bush for and on account of one Bryan, was brought into St. Andrew's Bay, and sold by Bush for Bryan to Orman & Young some time in 1828. The bill, amounting to $1,510, was receipted by Bush to Orman & Young, in order to secure the goods against an execution in the hands of the Sheriff against said Bryan. The general account of Bush with Orman & Young was afterwards settled by Rufus Sewall. It does not appear positively that the bill of goods was ever paid Bush by Orman & Young, and if not, Sewall should be credited with $750, which appears to have been the balance of Bush's account with Orman & Young, leaving out the $1,510. In this opinion Messrs. Webb & Bertrum agree. Mr. Horne dissenting. My reasons for differing with my associate auditors in the foregoing case is, that if Mr. Bush's testimony is allowed in this case, I think it went to state, (if my recollections serve me,) that Mr. Bush did not receive payment for whole amount of the goods at the time he gave the receipt, but that Orman & Young did pay the whole amount before the transfer to Sewall, and if this be the fact, Sewall should not be credited with the $750.

The amount standing to the credit of Rufus Sewall on page 1st, is the amount as taken from the books of Orman & Young, and does *not include interest, commission or differences of exchange,* which, according to mercantile rules, he

should be allowed. His account, including those items, shows a balance of $26,262 57-100, instead of $25,882 51-100. The auditors beg leave further to state in relation to themselves, that they were engaged for 20 days in the most arduous duties, and found the business of an extremely complicated and perplexing nature, &c.

Having stated the pleadings, it will be observed that the cross bill was filed to obtain the rescision of an agreement entered into between said Rufus Sewall and said Orman & Young, who had been partners in trade under the name, style and firm of Orman & Young, and in which the said Sewall purchased the interest of his said co-partners. In said agreement is embraced a bond given by said Sewall to said Orman & Young, with one E. J. Bower as surety, and a conveyance and transfer by said Orman & Young to said Rufus Sewall of all the assets of any description in any way belonging to or acquired by the said firm of Orman & Young, which bond and conveyance are reported at full length in the 9th Florida, pages 28 and 29. The application for rescision is made by the purchaser, whom it appears was a dormant partner, residing at a different place than where the business was conducted, and who charges that his co-partners took advantage of his pecuniary necessities, of his want of knowledge of the business, and by concealing from him the amount of the assets and situation of the business of the firm, and by fraudulent misrepresentations induced him to purchase their interest and enter into said agreement.

The cross bill does not seek to vary the written agreement, but desires to set it aside altogether, and that an account may be taken between the said late partners, or that the amount coming to him, (Sewall,) in consequence of errors, mistakes, &c., committed by the said Orman & Young in the estimate and representations made, may be ascertained and allowed him.

This partnership, which by the articles of association was to last two years, expired by its own limitation on the 7th March, 1828. By the articles it will be seen that at the expiration of said two years, or as soon thereafter as the said Orman & Young could bring the business to a close, or to such a state as to determine the actual amount of net profits arising on all the business transacted within the aforesaid two years, the net profits were to be divided in proportions of one third, and the said Orman & Young were to pay over to said Sewall his one-third on or before the first day of March, 1829, with interest from the time said net profits were ascertained.

It will be further seen that it is provided that " *all the profits belonging to said concern at the expiration of the aforementioned two years, to be valued by the said parties, and sold or bought by them as they may agree.*" ·

It appears by the pleadings and proofs that the relative position of these said partners was as follows: The business at Andrew's Bay was managed by Andrew Young; that at Webbville or Chipola by Thomas Orman, with E. J. Bower as clerk and principal book-keeper, while Sewall, the dormant partner, resided in Mobile.

It also appears that on the 7th March, 1828, when the partnership was to have expired by its own limitation, the said Orman & Young, in compliance with the written request of Rufus Sewall, took an inventory of the stock then on hand. It also appears that after said inventory was taken the said Orman & Young took the goods on hand and commenced business on their own account. The said Orman & Young considered the partnership at an end, and in thus appropriating the goods treated it as a purchase on their part. Whether said Sewall ever consented to their taking the goods on their own account does not appear. Orman & Young in their answer say, that in April, 1829, when Sewall

was at Webbville, they told him of their taking the goods, and he did not object, but we have been unable to find any evidence supporting their allegation. On the contrary, the said Sewall claims th's act as constituting a *new firm*, and this is what is meant by the term " profits of the new firm," wherever that term is used.

Thus matters stood in April, 1828, when said Sewall went to Webbville and commenced negotiations. It appears that said Sewall then claimed there was due and owing to him the sum of $28,700. He then received from Orman & Young $2,635, but no definite action was taken. Again in December, 1828, said Sewall went to Webbville, and various propositions were made, which finally resulted in a settlement on the 14th January, 1829. This settlement, made under these circumstances, is the one sought by this cross bill to be rescinded or corrected.

The legal character of this settlement has been determined. See 9 Florida, page 56, to wit: " That the partnership property was not left in the hands of Sewall to pay debts with, he assuming a trust. On the contrary, the same is *bona fide* sold to him. A conveyance to him is executed by Orman & Young, in which they covenant to warrant and defend him against their claim. The partnership is dissolved, a final settlement and distribution made, a sum of money paid, an agreement entered into between the partners, in which the creditors are not parties; that said Sewall as part of the purchase money, will pay all the debts not specially out of the partnership property, but that he would pay them, and as an indemnity against their suffering damage, he executes a bond with security."

Before proceeding to consider the grounds upon which the relief is asked, and the testimony supporting the application, it becomes important to consider the principles in

11

equity, upon which an agreement like this reduced to writing, will be opened.

The relation of the parties to the contract which was the subject of relief in White vs. Walker, 5 Florida, page 480, was different from the one at bar. In that case the vendor being a partner, prayed relief against the purchaser, also a partner, the purchaser having had the exclusive management and control of the business. Still for the most part, the principles there laid down, as far as applicable, may be adopted as rules for the government of the case at bar. In said White & Walker, the Court say: "It is a general and most material rule in all cases of accounts, that where there has been a settlement, and the account has either been signed or a security executed at the foot of it, a Court of equity will not open that transaction, unless the evidence produced, (founded on the charges in the bill,) shows the transaction to be so iniquitous that it ought not to be brought forward at all to affect the party sought to be bound."

First. It is contended that this settlement should be cancelled or errors and mistatements therein corrected, upon the ground that it was founded in fraud and grossest oppression, in that the said Sewall was greatly embarrassed, and the said vendors knew this and availed themselves of his embarrassments and necessities to exact it.

This is charged in the cross bill, and does the evidence produced sustained it? It is well settled that equity will relieve against a contract where the party complaining was greatly embarrassed, and the opposite party availed himself of that embarrassment to force a settlement favorable to himself.

This principle presents two questions for inquiry: First, whether it appears from the evidence that said Sewall was, at the time said agreement was entered into, greatly embarrassed, which was known to Orman & Young, and they

availed themselves of his embarrassment in making said sale. Secondly, whether the transaction was so iniquitous that it ought not to be brought forward at all to affect the said Sewall. The said Orman & Young in their answer to said cross bill do not directly deny the alleged previous embarrassments, but do most positively deny taking any advantage of the necessities of said Sewall, and particularly deny that it was with a view of making the most of said Sewall's necessities, that a settlement and payment was not made in said December to him, and in their said answer give reasons for their refusal, to wit: That the affairs of the old firm had not been brought to a close, so that his share could be ascertained, nor had the time arrived when his share was payable, and that they had not made collections sufficient to pay off the amount due him on account of acceptances.

The testimony of Mr. Bower, together with the articles of co-partnership, sustain the reasons given. Mr. Bower, in his deposition taken before the auditors, is asked in the 34th interrogatory: "Do you or do you not know that from the situation of the books then being behind hand in posting, &c., that it must have been almost impossible from the situation and extent of business and amount of debts due to Orman & Young, to have got at anything like accuracy in the amounts in the time this trade was in its negotiation to completion?"

To this he answers and says: "It would have been extremely difficult, if not impossible to arrive at anything like the correct amount due Orman & Young in the time the trade was negotiating." It was stated in argument as an additional excuse, that the two notes, one of $2,500, the other of $1,500, given by Orman & Young to Sewall, in March, 1826, for the stock of the late firm of William Hitchings & Co., and three other notes, one for $2,700, one for $3,186.75, and the other for $2,500, given by them to Sew-

all, which formed a part of the demand then made upon them by Sewall for settlement, were in the Tombigbee Bank, transferred to that Bank by said Sewall, and that they were notified by said bank not to pay the same without receiving the notes with the endorsement of the bank thereon. This is not stated in the said answer to the cross bill as one of the reasons why they did not settle with said Sewall, in December, or at any other time, although it does appear in the testimony.

It is contended by the complainant that the said excuses were false and deceptive, and pretexts for taking advantage of Sewall's embarrassments:

First. Because they constituted but a portion of their debt to Sewall. Secondly: That the allegation of the want of funds is disproved by their letter to Taggard by making large engagements, and the highly prosperous state of their new firm, which it is contended shows that their funds were devoted to the new firm, and not to the payment of the debt of Sewall.

The testimony of Mr. Bower in answer to the 22d interrogatory, and said letter of Taggard is relied upon as showing excuses false.

Mr. Bower says: "I understood from Orman that the reason a settlement was not then made was, that Rufus Sewall had not with him the notes of Orman & Young, and certain other documents that were necessary in effecting a final settlement."

The letter to Taggard & Co. bears date 15th August, 1828, and the following is an extract from it, being that portion cited in evidence, viz :

"Yours of the 2d July last was duly received. We expect you to use your good judgment in effecting sales to best advantage. When Mr. Rufus Sewall left here for Mobile thence to New York, it was understood that he would

arrange to your satisfaction the amount for which you were so good as to become our acceptor for. If this is done after paying yourselves the charges against us, we wish the balance paid to R. Sewall or his order. If this is not done, we wish you to force sale of the cotton necessary, and apply so much as will meet the drafts you accepted for us and your charges, the balance you will pay to Mr. Sewall or his order."

The above testimony of Bower sustains the answer of Orman & Young, so far as it goes, and to give the effect to the evidence contained in their letter to Taggard & Co., which is urged by the counsel for Sewall, would be straining the rule of construction to a great length. It will be seen this letter was written in August, 1828, four months before December, and when we refer to the testimony of Charles Sewall and Bower, it will be seen that Taggard & Co. refused to supply their order. We can see nothing in this letter inconsistent with the assertion of Orman & Young in their answer, that they had not made collections at that time sufficient to pay off the amount due him on account of acceptances, nor that the affairs of the old firm had not been brought to a close, so that his share could be ascertained. The most that can be made of it would be that they were carrying on business on their own account or continuing in the partnership business.

As we have already seen, the answer to the cross bill in that part which is directly responsive to the bill, denies that it was with a view of making the most of Sewall's necessities that a settlement and payment was not made in said December to him.

There being no evidence in support of this charge overcoming the effect of this answer, we are to give it credence.

It is alleged in the cross bill and urged by the complainant Sewall, that said Orman & Young conducted the busi-

ness of the firm, and had full knowledge of it, and that said Sewall was entirely ignorant of their property, the character of the debts, the amount and the prospect of their collection, that he could get but little information from the books, as the business was of long standing and intricate, and satisfactory knowledge in that respect could only be acquired by long and laborious engagement in the business itself; that said Orman & Young having knowledge of the true situation, suppressed it from said Sewall. From this it is urged by the solicitor for complainant, that this was not a case of bargain and sale; that there was no equality between the parties; that Sewall knew nothing of the nature and extent of the business, and that the business was so large and extensive that he could not acquire full and adequate knowledge, and therefore, knowing the superior knowledge of Orman & Young, he relied upon their estimate.

This brings us to consider leading principles in equity applicable to such a charge.

It is well settled that a suppression of truth, or suggestion of what is not true, in some material point, will be ground for setting aside any contract. And in case of Partners, Story in his Equity Jurisprudence, vol. 1, § 220, lays down the rule to be, that "If a partner who exclusively superintends the share and accounts of the concern, should, by concealment of the true state of the accounts and business, purchase the business of the other partner for an inadequate price by means of such concealment, the purchase will be held void." A fortiori, we hold that if a partner who exclusively superintends the business and accounts of the concern, should by concealment of the true state of the accounts and business, sell his share of the assets of the firm to a co-partner for a disproportionate price, by means of such concealment, the purchase will be held void.

Again, concealment of a material fact by a party to a con-

tract is ground for relief, where he had better opportunity to know than the other; but where the facts lie equally open to the vendor and vendee with equal opportunity of examination, and the vendee undertakes to examine for himself, without relying upon the vendor's statement, it is no evidence of fraud that the vendor knew facts not known to the vendee, and does not make them known to him. Halls vs. Thompson, 1 S. & M., 443.

A misrepresentation by a vendor, to be ground for a recision of the contract, must be in reference to some material thing unknown to the vendee, either from not having examined, or from want of opportunity to be informed, or from entire confidence reposed in the vendor, and his remedy must be pursued in good time after the injury is discovered. Halls vs. Thompson, 1 S. & M., 443; Ayers vs. Mitchell, 3 S. & M., 683.

In the case of White vs. Walker, 5 Florida, 479, which was a case between partners, this Court say: To these general rules there are qualifications, suited to cases of extraordinary nature. As if the party making the representation was speaking not from personal knowledge, but with reference to accounts that were equally open to both parties, and the representations were justified by such accounts.

With these general principles and qualifications for our guide, let us proceed to enquire whether the evidence sustains the allegations in the cross bill in this particular.

The cross bill alleges that Orman & Young had the books in their own possession; had made all or nearly all the entries; were personally acquainted with every transaction of the firm, and must have known the true state of their concern; that they made an estimate in writing of the business affairs of the firm, which they submitted to him, said Sewall, as correct.

The following is the estimate of Mr. Orman, viz:

| | |
|---|---:|
| Amount of notes | $28,400 |
| Accounts | 16,600 |
| Goods on hand | 7,000 |
| Cotton | 4,000 |
| Gin-house and lot | |
| Horses and mules | 1,000 |
| Corn, pork, &c | 1,000 |
| One negro man | 300 |
| One negro woman and child | 600 |
| Two negro boys | 900 |
| | $59,800 |
| Houses and lot at the Bay and this place, at least | 200 |
| | $60,000 |
| Debts due from the concern | $24,000 |
| R. Sewall's amount previous to 7th March, 1828; his share of profits | 6,000 |
| Amounts owing here, and amounts settled, and bad debts | 5,000 |
| | $35,000 |

That on furnishing this statement the said Orman & Young proposed to sell their interest of the firm to said Sewall for $17,500, and said Sewall avers that it was on *this statement* he acted, and confiding in it, he was induced to accept the offer made by them. The said Orman & Young in their answer severally deny these allegations; they deny that the statement was submitted by them to said Sewall as correct; they deny that the proposition to take $17,500 came from them, and aver that it was Sewall's own proposition; they deny that they had any knowledge of the business which was not equally open to examination by said Sewall, and aver that Sewall did undertake and did examine the books for himself; they deny that he relied upon their statement; they aver that he inquired for himself, consulted the clerk of the store, and acted upon his own infor-

mation; they also deny that amount of the shares was accurately attempted, but aver that it was a rough estimate of the aggregate amount, made for their own information, and deny that said Sewall acted upon it as a correct statement, and they positively deny any concealment or misrepresentation. It appears from the testimony of Mr. Bower that said Sewall visited Webbville in April, 1828, and at that time he examined the books, and received in payment of his advances $2,635.00, and that he returned again in December, and remained there until the settlement on the 14th of January, during which time he had access to the books, examined them, and consulted the book-keeper.

Mr. Bower, in his testimony taken before Commissioners, on the 20th June, 1831, says on this point: "Sewall was at Webbville, in March or April of the same year, when he attempted to make a settlement with Orman & Young, who declined doing so, because (as they informed me) Mr. Sewall had their notes to a large amount, which he was not prepared to give up. During the time, and afterwards, when said Orman & Young were absent, I had charge of the concern. *Said Sewall had free access to the books and papers, and had a fair opportunity to examine and calculate for himself.*"

In his testimony taken before the auditors, he says : "In April, 1828, Orman & Young were endeavoring to trade in some way, but heard no offer or proposition, except by Mr. Sewall, who made some figures on a piece of paper and held it up to Orman & Young, and said he would give that, meaning, I suppose, the amount stated in figures. During Mr. Sewall's stay at Webbville in April, 1828, as well as at all other times when I was in the store, he had free access to the books and papers belonging to the concern. He was there a day or two in Mr. Orman's absence to New Orleans, but

12

whether he examined or made any calculations I don't re-collect. Mr. Sewall and myself *frequently conversed upon the profits of the business previously done* by Orman & Young, and the prospect of doing business by a separate concern, to be established at Webbville, which was then con-templated. He further says that he paid said Sewall during Mr. Orman's absence at that time two thousand dollars, as will appear by the books.

That Mr. Sewall posted himself up pretty well as to the business of the concern during his visit in April, is evidenced from the fact that we find that on the 29th of July follow-ing, he writes to said Bower, and encloses him a statement of the whole business, as follows, viz:

| | |
|---|---|
| Notes and accounts | $17,947.62 |
| do do., | 16,491.16 |
| Aug., | 1,660.00 |
| Goods, | 6,000.00 |
| Cotton, | 4,000.00 |
| Gin-house, | 1,000 00 |
| Cash, | 1,000.00 |
| Gyves, | 1,800.00 |
| | $58,868.78 |

BAD AND DOUBTFUL DEBTS.

| | |
|---|---|
| R. S., | $19,800.00 |
| R. S., | 5,250.00 |
| N. O., | 3,200.00 |
| N. Y., | 450.00 |
| | $28,700.00 |

Trial January 1st, 1829.

Orman & Young's indebtedness is above in this way, ac-cording to their own accounts:

|  | Dr. |
|---|---|
| One note due on the 1st February, 1828, | $ 2,500 |
| One note due on the 1st May, 1828, | 1,500 |
| One note due on the 1st April, 1829, | 500 |
| On demand, | 11,659 |

Stephens vs. Orman.—Opinion of Court.

| | |
|---|---|
| Do do., | 2,535 |
| Do do., | 50 |
| Do do., | 3,180 |
| Mr. Sewall's account, | 5,200 |
| Payment, | 3,000 |
| Received payment, | 95 |
| | 15,434 |
| My account in Boston since in cash paid, | 3,200 |

$49,323

Cr.

| | |
|---|---|
| By proceeds of 10 bales of cotton, | $5,500 |
| By proceeds of 320 bales of cotton, | $ 9,497 |
| Draft on New York, | 960 |
| 115 bales shipped to Liverpool, | 4,200 |
| 164 bales shipped to New York, | 5,200 |
| Cash, | 2,000 |
| Freight, | 615 |

$28,492

$28,492

26,831

Being.........................................$7,500

One-third profits of $23,331 is the whole business. It would appear by this, that by some means or other said Sewall had arrived at the estimate of $28,331 profits, and that one-third of that was his share.

In December, 1828, Mr. Sewall is again at Webbville, and renews negotiations, which are completed on the 14th of January. . Of this Mr. Bower testifies, "I know but little that took place while the negotiation was pending, except what I learned from Rufus Sewall. He informed me of their progress from time to time, and consulted me on the business generally, and on particular points *wherein he entertained doubts, and on which he was ignorant.* I don't know whether Rufus Sewall had free access to the books, papers, &c., during this time, as I was seldom, if ever, in the store,

but heard no complaint of Mr. Sewall of the contrary. I don't recollect that he consulted me as to the value of the property, but believe he did. No inventory of the stock on hand was taken at the time of the trade, as I ever knew or heard of from either party, but have always understood from both parties that the goods were roughly estimated at, I believe, seven thousand dollars, including those at St. Andrew's Bay. All the other property was estimated in the same way, with the exception of the notes, accounts, &c., which I *supposed to have been as correctly ascertained from the books and papers as they could be under the circumstances.*

I understood from both parties that the trade was a general and lumping one, and that the estimate was made out for the purpose of arriving as near to value of whole concern as they could, without measuring, weighing or counting anything."

Again, in his deposition taken before commissioners, on the 21st May, 1831, he testifies : "I do know of the trade between Orman & Young and Rufus Sewall, for a stock of goods and a quantity of other property to a large amount. The goods were estimated in the statement hereunto annexed, in the *handwriting of Rufus Sewall*, at six thousand dollars, though I believe they were estimated by Orman & Young at seven thousand dollars. The same goods were afterwards included in the concern of Bower & Sewall at six thousand five hundred dollars. Said Sewall *frequently advised and consulted with me on the subject of the trade while it was negotiating*, and on particulars about which he seemed to be doubtful, and on the general character of the debts due to the concern, but not (as I recollect) as to the aggregate value of the whole concern.

I considered the trade a lumping and general one, and not of specific articles. No inventory was taken of the goods. Said Sewall was evidently dissatisfied with the trade while

it was negotiating, as he expressed to me at the time, but said it was the best he could do, that Orman & Young had a large amount of his property in their hands, which he must have the control of. *After the trade was consummated, he seemed to be better satisfied.*"

Sears Bryan, another witness, says: He was present when a conversation arose between Orman & Young and Rufus Sewall, for selling of their, (Orman & Young's) interest in the concern, which took place opposite the old store of Orman & Young, in Webbville; that Rufus Sewall offered them $17,500, and his convictions were at that time, that the bargain was closed upon that instant. The auditor's report is referred to as showing that there was such a discrepancy between the true state of the affairs of the concern and the estimate made the basis of the settlement, that there must have been concealment and suppression by said Orman Young. This report is in evidence, and is made the 29th August, 1831. The auditors say that after having gone into a minute and full examination of said books and accounts, beg leave to report the following as correct showing from the books:

Dr. The old Firm.

To amount due Rufus Sewall on the 1st of January, 1829, .............................. $22,021.76
Debts in New Orleans, ..................... 3,157.65
do in New York, ...................... 427.12
Bad Debts, ................................ 5,000.00
Balance, .................................. 25,882.51

$56,489.04

| Orman & Young, | Cr. |
|---|---|
| By Notes, ..................................... | $27,396.75 |
| By amount of Accounts, ..................... | 15,697.14 |
| Cotton, ...................................... | 3,255.30 |
| Corn and Pork, ........................ ..... | 911.71 |

| | |
|---|---:|
| Negroes, Horses, Gin-House, &c., | 2,430.00 |
| Goods on hand, | 6,500.00 |
| Thomas Orman's private account, | 233.68 |
| Andrew Young's private account, | 44.46 |
| | **$56,489.04** |

It will be observed that the auditors do not expressly give the amount of the *share* of said Sewall in the profits, but make a balance of $25,882.56, from which we are to divide.

We have now before us three statements from which we are to make estimate of the share of the profits of this firm. In the one made by Orman & Young, which formed the basis of this settlement, it will be seen that the assets of the firm were put down at $60,000, leaving a blank for value gin-house and lot, which would be so much more.

| | |
|---|---:|
| Debts due from the concern, | $24.000 |
| R. Sewall's amount previous to 7th March, 1828, his share of profits, | 6,000 |
| Amount of bad and doubtful debts, | 5,000 |
| | **$35,000** |

Deduct the $35,000 from the $60,000, leaves a balance for division of $24,000.

Divide the 25,000 into three shares, makes a share $8,333, which would make due Orman & Young $16,666.   They received $17,500, being according to this statement, $834 more than their share.

| | |
|---|---:|
| Mr. Sewall, in his statement enclosed to Mr. Bower, makes the assets | $53,868.78 |
| And bad and doubtful debts, and debts owing from the concern, | 28,700.00 |
| Which makes for division a balance of | **$25,168.78** |

Divide this by three, and a share is $8,356, making due Orman & Young $16,712.   They received, according to this statement, $778 more than their share.

In the auditor's report a balance of $25,882.51 is reported for dividend.

Assets are reported at.........................$56,489.04
Debts, bad and owing,.....................$30,606.53

Divide $25,882.51 by three, makes a share $8,624.17, and due Orman & Young $17,248.34. They received $17,500, being, according to this statement, $251.66 more than their share.

The testimony sustains the answer which is responsive to the cross bill in the following facts, (i. e.,) That said Sewall had free access to the books; had equal opportunity of examining into the business and situation of the firm; that he did undertake to examine for himself, and consulted and advised with Mr. Bower, the confidential clerk of the concern; that he did not rely upon the statement made by Orman & Young; that *said Sewall made the offer to purchase for the $17,500*, and that it was not the offer of Orman & Young as alleged. The above comparison of the three estimates conclusively exhibits that the estimate of profits for division made by Orman & Young was not far out of the way, and probably as correct as the situation of the affairs of the concern would warrant, they not attempting to give them of their own knowledge. Thus we think this statement comes within the qualification laid down in White vs. Walker, above.

Besides, it is a well established principle in equity, that nothing but what is plainly injurious to good faith ought to be considered as a fraud sufficient to impeach a contract.

We might here dismiss this branch of the case and proceed to the inquiry, whether the specified errors and mistakes set forth in the cross bill are established, and whether compensation should be made to the extent ascertained; but it is claimed that the profits of the new firm were not included, and that Orman & Young concealed these, that is to

say, the profits of the business claimed by Orman & Young to have been transacted on their own account between the 7th March, 1828, and the 14th January, 1829, the said Sewall claiming in argument to have continued the partnership during that time. This brings up the important question whether the partnership was dissolved on the 7th March, 1828, or whether by acts of both parties it was impliedly continued until the settlement in January, and whether these profits were or not included in their bargain.

It will be noticed that the cross bill makes no mention whatever of the "new firm." It makes no charge that the profits of this firm were withheld, nor does it set up any claim that the partnership continued. By the articles of agreement the partnership was to expire on the 7th March. It appears that Sewall writes Orman & Young, "our term of co-partnership expires 7th March. I wish you to take account of stock and forward them by mail, as I shall be unable to leave Mobile till in April. Give me your ideas as to the business; close it as fast as is in your power." It appears from the evidence of Bower that account stock was taken at the time, and that Orman & Young took the goods on their own account, opened a new business and new books, treating Sewall as no partner in the new concern. Still, according to the testimony of Bower, carrying on business on the same capital as before.

There is no other evidence of any direct communication between the parties as to the cessation of co-partnership at that time.

The only act of Sewall, excepting silence, that would indicate a continuance, is the purchase of the bill of goods sent by schooner Orrroll, and this act the evidence shows to have been equivocal.

Orman & Young sent their order for goods to Taggard & Co., who declined it. Says Charles A. Sewall in his testi-

mony, "while in New York I heard William Taggard, of the house of William Taggard & Co., observe to Rufus Sewall, I have received an order from Orman & Young enclosing a memorandum of goods which they wish me to purchase. I have no funds of theirs now in my hands, and you can take the order and purchase, and to my knowledge Rufus Sewall did make purchases of the order. The goods thus purchased were shipped on board schooner Carroll, which vessel meeting with some disasters out, I deemed it prudent to abandon my interest to the underwriters, and Rufus Sewall likewise abandoned the interest of Orman & Young. There is no evidence that either Orman & Young ever recognized the purchases made by Sewall, in October, 1828, or that they ever paid any of the persons from whom he purchased at the time, or that any of the goods were ever received by them.

There is no doubt but that Orman & Young did wrong in appropriating the goods to their private use on the 7th of March without the consent of said Sewall. This was not the way to wind up the partnership affairs, and the law in such cases is, that if a partner continue to trade with the joint property after dissolution of the partnership, he must acount for the profits, and if it was continued by express or implied consent after the period fixed by the articles of agreement, in such case the stipulations of the original will be considered those of the continuing partnership, and it is then a partnership at will. 17 Vesey, 298; Mifflin vs. Smith, 17 Sergt. & Rawle, 165.

On the former adjudication of another branch of this case, (see 9 Florida,) this Court considered the partnership dissolved at the execution of the agreement, on the 14th January, and after a most patient and thorough examination of the evidence in the case at bar, we are forced to conclude

that by operation of law this partnership was continued by implied consent, and not dissolved until the 14th of January. There is no direct and positive evidence that these profits of the "new firm" were included in the estimate, although that conclusion, from the facts, is irresistible.

It clearly appears that said Sewall was at Webbville in April, and that the said defendants were at that time notoriously carrying on business, claiming it to be on their own account. New books were opened—he talks with Bower about the business of a separate concern, and proposes to Bower a partnership, and at the same time talks with Bower upon the profits of the business previously done. The extent of the business which the "new firm" were doing was communicated in a letter of Bower to him, dated September 15, 1828, in which Bower says: "Business has been tolerably good this summer; we have sold since the 7th March upwards of $11,000 worth of goods." In July, after Mr. Sewall had visited Webbville, he makes out a statement and encloses it to Mr. Bower, in which he makes no specific mention of the profits of the new firm. If he considered the partnership as continuing, and claimed the profits of the new firm, he must have included them.

Again, in December, Orman puts an estimate into his hands in which no specific mention is made of the "new firm." Mr. Sewall had then full knowledge, derived at least from Bower, of the prosperity of the new firm. No objection or remark appears to have been made by him, because this article is not specifically mentioned. An article of so great amount, being, as is claimed, a profit of upwards of ten thousand dollars, certainly could not have escaped notice.— Again, Orman & Young convey to said Sewall all the assets of any description in any way belonging to or acquired by the said firm. From this silence of Mr. Sewall, in connection with these facts, one of two things is conclusive, viz: That

the amount was included in the estimate of both Orman and Sewall, though not specifically named, or with full knowledge thereof he forgave and remitted any profits which they may have derived from said use of the old partnership property. Either view (holding as we do that the partnership was not dissolved until the agreement was entered into in January) renders the further pursuit of this question unnecessary.

There are other charges of concealment made in the argument of counsel, but not set forth and alleged in the cross bill, viz: That their statement furnished did not contain an allowance for commissions for advances, commissions for acceptances, interest on the notes of $4,500, given in 1826, at the partnership formation; that he got no allowance for winding up the concern, and that he did not get interest after the share was ascertained.

It will be readily seen that all these items must of necessity been well known to Mr. Sewall when he made the purchase and perfected the settlement. They are in fact matters which were better known to him than to Orman & Young: certainly he had an equal opportunity of knowing them. Therefore, without going into an examination as to whether they were or were not proper charges, we are of the opinion he had full knowledge of these, his demands, and knew they were not embraced in the said estimate, and acted upon that knowledge when he made the settlement and purchase and gave his bond, thereby relieving the said Orman and said Young from their agreement to close the business of the concern and *assuming that labor himself*.

Another item of complaint is, and this we would remark is charged in the bill of complaint, that Orman & Young took the notes for the amount or share going to them, which were more valuable and drew a higher rate of interest. This seems consistent with their bargain. Mr. Sewall makes the

proposition to allow them to select and take notes due the firm to the amount $17,500, if they will convey to him all the residue of the assets of the firm. Orman & Young accept the proposition and select the notes. Now if they selected the best notes, those drawing the highest interest, the agreement between the said parties allowed them so to do.

It appears that said Sewall had equal opportunity of knowing what interest the notes were drawing ; a list thereof with the names, amount and rate of interest was before him. Certainly there is nothing appearing by which he was prevented from guarding against such a selection of notes, had he felt so disposed.

If he made an improvident bargain it is his own fault.— The mere fact that an agreement is improvident is no ground for setting it aside. It can only be avoided because of surprise or mistake, want of freedom, undue influence, the suggestion of falsehood or the suppression of truth. Green vs. Thompson, 2 Iredell Chy., 365.

It is contended by the learned Solicitor for said appellant, that said Orman & Young were the trustees of said Sewall, and made a bargain advantageous to themselves, and should not, upon the principles of equity governing transactions between trustees and *cestui que trusts*, be permitted to hold any such advantage. In support of which the case of Miehoud et al vs. Girod et al, 4 Howard U. S. Rep., page 556 ; 1 Story Eq., §323, are cited—a principle which was fully considered in this Court in Bellamy vs. Bellamy, 6th Florida, 63.

Whether these principles are applicable to this case, depends, we think, upon whether the partnership was or was not in existence, and continued expressly or impliedly from the 7th of March up to the time of the entering into the agreement. The rule in such cases appears to be that before a dissolution, partners are joint tenants of the partnership

property, each of them having an interest in the entire possession, as well of every parcel as of the whole, and without survivorship, each partner embracing the character of both principal and agent, hence the relation is not so broad as that of Trustee and *cestui que trust*.

After a dissolution each partner becomes a trusteee for the others as to the partnership funds in his hands, in order to effect a fair settlement and just distribution of the effects. Allison vs. Davidson, 2 Dev. Eq. Rep., 79.

We have already decided that this partnership was not dissolved before the execution of the agreement.

In view of the facts, we are constrained to hold the rules of equity above laid down, and acted upon as those that should govern in this case.

Applying the facts to those rules, we cannot say the evidence establishes that by the acts of Orman & Young or either of them, the said Sewall was entrapped into an agreement in which he would not otherwise have involved himself, nor that there is such a glaring inadequacy as of itself to stamp the transaction with fraud, by shocking the common sense of honesty, and thereby render the settlement void. The basis of the settlement is therefore sustained.

This brings us now to the consideration of the specific charges of errors and misrepresentations set forth in the cross bill.

And first as to the note against James Webb: The cross bill charges that they represented in the list of notes that there was $769.47 due on this note, when in fact there was but $275.53 due. The answer avers that said Sewall was apprized that Webb was entitled to a credit for corn and cotton, which they believe was entered on the books about the first of January, 1829. On referring to the list it appears to be set down as represented in the cross bill, and opposite the name the word " error " is written as is contended by the

appellees. There is no evidence sustaining the answer, and
the only thing urged in the argument is, that as the word
" error " is written opposite Mr. Webb's name, that therefore
such a circumstance could not have escaped Mr. Sewall's at-
tention. Mr. Bower, in his answer to the 33d interrogatory,
testifies that the notes and accounts were not "roughly esti-
mated," that he supposed them to be as correctly ascertained
from the books and papers as they could be under the cir-
cumstances. At a subsequent examination before the audi-
tors he says in answer to the 8th interrogatory, " the amounts
of accounts were taken from the books as balances due as
near as could be ascertained under the circumstances." It is
manifest from the evidence that such was the nature of the
business, manner of conducting it and situation of the books
at the time of the settlement, that the amount of accounts
could not be ascertained with accuracy, hence the necessity
of allowing $5,000 to cover bad debts, errors and mistakes.
But with notes which are " papers," more certainty is ex-
pected. If payments are made upon notes, the usual course
is to endorse the same upon the note. Then upon the in-
spection thereof, the credits would appear.

Upon referring to the list which formed the basis of this
settlement, it will be seen the notes are set down with cer-
tainty.

The original amount of the note is first given, and if a
balance, the word "bal." is written opposite, then follows
the time when the same is due, the rate of interest, the
amount of interst, and finally the total amount, the aggre-
gate of the whole being thereby represented as $28,400. In
making up this aggregate, the note against James Webb is
footed up at $769.47.

It is true the word " error " is written opposite to Mr.
Webb's name. There is no evidence that his attention was
ever called to it, and at the most the word error is not ex-

pressive of the true situation of the note, for it was only error in part, yet with the word error written opposite it, the total amount is carried out, and still $28,400 in notes stands as the amount of notes. The credit doubtless was overlooked, and the misrepresentation, through the instrumentality of the list, innocently made, consequently correction of the said misstatement being in amount $493.94, should be in justice made.

The next charge is a misrepresentation in the amount due on the note of Sears Bryan. The answer makes explanation of the discrepancy, yet upon examination of the list of notes, we do not find any such note as alleged, nor any amount in aggregate due from said Bryan as charged. There are four notes contained in the list of different amounts, but none amounting to $835.84, while the four are in aggregate a much larger sum; but in taking three of them, they do give just the amount set forth in the cross bill. The cross bill charges that there was in fact only due on these notes $757.63. The answer responds by saying that if we add thereto the note and account on Bryan & Marshall, the sum set forth in the list will be found correct. We have no evidence on either side respecting this charged discrepancy, excepting such as may be implied from the bill and answer.

If we take the admission in the answer, we must take it in toto, and if we thus receive it, the difference is accounted for, or in other words the alleged misrepresentation is not sustained.

The next item is the representation of the amount due from Richard S. Watson. The response in the answer to this charge is that Watson was credited on his note while the trade was negotiating. There is no evidence that said Sewall had any knowledge of this credit, which would vary the aggregate $33.77.

In the absence of any proof, we cannot but consider this

a misrepresentation, (though innocently made), which should be corrected.

The next allegation is, that the list of notes represented as due on the note of Sion Smith & Jos. Russ the sum of $816, when in fact there was only due $55 27.

The answer to this charge avers, that said Sewall was informed and knew previous to said settlement, that said Russ had delivered cotton, which said Russ claimed should be credited on this note, as per agreement claimed by said Russ to have been made with said Young, but which agreement was denied by said Young—said Young claiming that the cotton should be credited on an open account. Mr. Bower testifies in his deposition before Commissioners, that he recollects having a conversation with said Sewall immediately before or after the trade, he thinks it was before, on the subject of Thomas Russ' note, and Sion Smith's and Joseph Russ' note, in which he told him all he knew about it, and particularly stated an understanding between said Russ and Young in the fall preceding which, according to the understanding, was to be applied to the payment of this note.— Again, in answer to interrogatories propounded to him before the auditors, the agreement is set forth, and the misunderstanding between Russ and Orman & Young explained. We can readily see that in disputing the right of Russ to have this cotton credited on the note, they might consider the note as due and enter it upon the list. The only question was, whether the cotton should be credited on the note or account. That said Sewall was informed of the dispute at the time of the settlement, is quite apparent from the whole testimony of Bower. Mr. Sewall, it appears, afterwards settled it with Russ, and if in doing so, he was the loser, it was owing, according to the testimony of Bower, to his having made concessions and yielding what he was justly entitled to.

The next allegation in said cross bill is, that this list represented as due from John Register the sum of $536 80, when in fact there was only $242 due. The answer of Orman & Young avers that this miscalculation occurred in taking the judgment thereon, and that this was at the time of said agreement explained to and known by said Sewall.—The only evidence is that of Bower and Gautier, neither of whom testify of the knowledge of said Sewall of, the true situation of said judgment *before* his settlement with Orman & Young, while both testify that it was known to Orman & Young. It appears that the witness, Gautier, advised Orman & Young to issue execution for the whole amount.—This may be a reason why the whole amount was set down in the list, nevertheless; it was a clear misrepresentation as to amount, and one which should be corrected. From the testimony of Gautier, execution was issued on said judgment and stayed by injunction, which was finally removed upon payment of $243. This sum deducted from $536 80, leaves the sum of $293 80 to be allowed said Sewall in correction.

As to the note against William Evans, there is no evidence sustaining the allegations in the bill. The same can be said of the allegations as to the notes of Graham & Pope and Thomas Nalls.

It is next charged that the note from Brown & Lott was represented in said list as having due thereon the sum of $1,342.10, when in fact there was only $1,192.10 due, being a difference of $150. The defendants in their answer responsive to this charge, say that a draft had been drawn on Brown and Lott for $50 in favor of E. Chambless, after the estimate and before the sale. There is no evidence further sustaining the allegation in the cross bill. We are therefore to take the admission in the answer, which is only as to fifty dollars. Whether said Sewall had any knowledge of this

14

draft, or that the amount represented in the list as due on this note had been charged at the time of his settlement with Orman & Young, does not appear. We are thefore forced to the conclusion there was a misstatement of fifty dollars, which should be corrected.

It is alleged that two notes of Sims & Murphy were included in said list, which should not in truth have been, inasmuch as they were received for merchandize purchased of said Orman & Young after the estimate was given in. The answer directly responsive to this charge says that said notes were obtained before the sale to complainant, and were with the sale transferred to him, which is in fact denying the charge. There is no evidence in the record sustaining the allegations as to these notes, therefore in conformity with the doctrine often announced in this count, an answer responsive to the bill denying the allegations therein is conclusive upon that question, unless overcome by the testimony of two witnesses or of one, with corroborating circumstances.

The next item of error charged is that two notes of J. B. Bryan and Thomas M. Bush were included in said list, and should not have been because they were given for the hire of two negroes for the year 1828, when the said negroes were transferred to said Sewall about one month after the date of the hiring, and that the hiring for which said notes were given belonged to said Sewall.

The defendants in their answer say that these notes were for the hire of the negroes of the firm, and that said Sewall had full knowledge of it at the time of the settlement.

There is no evidence in the record whatever touching this item; all the facts have to be gathered from the cross bill and answer. The simple question then is whether these notes were at the time of the settlement between these parties, Sewall, Orman & Young, notes belonging to the firm? It seems to us beyond a question they were. In the hiring

of these negroes, the firm had anticipated their wages, and made in advance the amount thereof part of their assets. Of course it effected the value of the negroes at the time said Sewall purchased them to the amount of the hire; but that is not the question here. They were compelled to sell and Sewall to purchase them under this incumbrance, consequently they were the notes of the firm. We cannot conclude there was any misrepresentation in putting these notes on the list.

Another charge is that Benjamin Hayes' note for $50 was not delivered by said Orman & Young to him, said Sewall.

The answer admits the allegation but avers that it was because they, the said Orman & Young, took it as part of the $17,500 purchase money. Upon looking at the list of notes set forth in the record as those which were thus taken by Orman & Young, we find no entry of any note of said Hayes, corresponding in amount.

Four notes of said Hayes were taken by them, but each of which is of a much larger amount than the one in dispute. There being no evidence to sustain the answer, we conclude there was a mistake, and the amount should be corrected.

The alleged misrepresenations set forth in the cross bill as to the amount of accounts due the firm, we have already somewhat noticed.

It appears from the evidence that the books were not posted, and that the business was so situated that it was impossible to set down the aggregate of these accounts with certainty; an estimate coming from either party must of necessity be a rough estimate.

It seems that Mr. Sewall had by enquiries, examination, and with the aid of Mr. Bower's information, satisfied himself in July, 1828, that the amount of the accounts were $16,491.16, as appears by statement enclosed by him to Mr. Bower.

The auditors report that they found the business of an extremely complicated and perplexing nature, and after twenty days' toil, ascertain the accounts to be $15,697.14. In the estimate complained of they were set down at $16,600, making about one thousand dollars difference. This difference will be reduced by taking out the $750 deducted from Thomas Bush's account, leaving a discrepancy of a few hundred dollars.

The estimate complained of does not appear to have been made from personal knowledge, but with reference to accounts that were equally open to both parties, and the representations were justified by such accounts. We think the estimate clearly in this respect within the rule laid down in White vs. Walker.

Again, it is complained that the goods were put down at $7,000, when it should have been but $6,000. The evidence is that these goods were sold by said Sewall to Bower & Sewall, for $6,500, and upon examination afterwards, articles were discovered to a considerable amount not included in the inventory, among which was a bale of domestics. Mr. Bower testifies that no inventory of them was taken at the time of the trade, and that he understood from both parties that the goods were roughly estimated. We see no ground for correcting this item.

It is charged that there was misrepresentation in estimating the cotton at $4,000. Here again we see that in July, after Mr. Sewall had spent some days at Webbville, and examined for himself, and made enquiries of Mr. Bower, he writes Mr. Bower setting down the cotton at $4,000. Mr. Bower's testimony in reference to the amount of cotton shipped, upon a calculation will be found confirming the estimate. The auditors, after their searching examination, report the amount at $3,255.30. The evidence is that such was the situation of the cotton, arising from their manner of

doing business, that Orman & Young could not estimate the amount thereof from personal knowledge, and therefore made an estimate without measuring, weighing or counting any thing, and as the means of making the estimate were equally open to both parties, we think there is no misrepresentation in the estimate in this item calling for a correction.

The next alleged error is that the corn and pork was estimated at a thousand dollars, when it should have been $800. The answer to this specific charge is, that they were estimated at their value at the time of sale, and as a gross estimate, nearly correct.

The auditors found them to be worth $911.71. The evidence is that at the time of the settlement they were estimated without measuring or weighing.

In view of this whole transaction, we cannot consider this a misstatement requiring the interference of the Court.

The next alleged misrepresentation is that two negro boys were put down at $900, which were purchased for $460.— The answer states, in response to this charge, that the negroes were worth the sum estimated to the firm, and that said Sewall did not object to giving that sum.

We have no evidence in the record as to the value of these negroes, nor can we tell what their value was fixed at by the auditors, for the reason the auditors embraced them with other property in one aggregate. The naked fact that they were purchased for $460 does not make it conclusive that this was the true value, nor can we conclude from this isolated circumstance that their true value was misrepresented.

It is charged that the debts owing by the firm were put down at $24,000, a much *smaller* sum than was actually owing, and that herein was a misrepresentation.

In their answer Orman & Young deny the charge of misrepresentation, and aver that they stated to said Sewall all the debts due from the firm as far as they were known to

them and recollected. The auditors report the sum of $25,-606.41, as the amount owing. It will be observed that of this sum $22,021.76, are found owing to said Sewall.

The extent of the indebtedness of the firm to him individually, he is presumed to be cognizant of, even more so than the other partners. In the absence of proof to the contrary, we are to believe he had equal knowledge of the indebtedness. It is apparent from the evidence and admissions of the parties that Mr. Sewall claimed that there was due to him a much larger amount than was admitted by Orman & Young.

In view of the entire transaction, we cannot consider that the difference in this item at all entered into the agreement, or in any way influenced the said Sewall in making the offer he did. Besides, Mr. Bower testifies, that he always understood and has never heard it contradicted by either party, that five thousand dollars were thrown in to cover bad debts, errors and small amounts *due by the concern*.

From this we conclude that the estimate was not considered as an accurate one, and that the subsequently ascertained discrepancy was provided for.

The last specific charge is, that the debts of the said firm in Jackson county, and bad ones, were improperly rated at $500. This charge is denied by the answer. There is no evidence sustaining the allegations as to this item, while on the contrary, Mr. Bower, as late as 1831, testifies from all he then knew, he believed it would be sufficient.

The next question is, whether, according to the principles well defined in equity, the ascertained misrepresentations innocently made as to the amount of notes, in the list thereof, can be corrected, if the agreement is not considered at an end, according to the alternate prayer of the bill.

The case of Allen vs. Hammond, 11 Peters, 72, is one in point. In that case the Court say: "The contract was

entered into through the mistake of both parties ; it imposes great hardship and injustice on the appellee, and is without consideration." Yet they allowed him compensation.

In Story's Equity Jur. vol. 1, §142, it is laid down that, " In cases of mutual mistake, going to the essence of the contract, it is by no means necessary that there should be any presumption of fraud. On the contrary, equity will often relieve, however innocent the parties may be."

Sustained by such authority, we feel warranted in making the allowances, which, in the aggregate, amount to $925 51, with lawful interest, from the 14th January, A. D. 1829, which sum should be allowed said Sewall, in the account before the Master.

The opinion of the Court is, that so much of the decree of the Circuit Court dismissing the cross bill be reversed, and that said cause be sent back to the said Circuit Court, with instructions that said cross bill be re-instated, and that the order of referance appointing Master, be so amended as to require said master to ascertain the amount of lawful interest due on the sum of nine hundred and twenty-five dollars and fifty-one cents, from the fourteenth day of January, A. D. 1829, which interest, when ascertained, to be added to the said sum of $925.51, and the whole amount thereof allowed said Sewall by said master, as an offset or credit against any said damages which the said Thomas Orman as surviving partner, &c., may be found to have sustained by reason of the said failure of said Sewall, &c. But if the amount hereby allowed shall exceed the amount of damages thus ascertained, then to enter decree against the said Thomas Orman, surviving partner, &c., for the difference.